SANDRA CABRINA JENKINS, Judge.
| i This case presents an issue of first impression as it relates to whether the *1182 crime of cyberstalking constitutes domestic abuse for the purpose of obtaining a protective order under the Louisiana Domestic Abuse Assistance Law, La. R.S. 46:2131, et seq. We decide that it does, and find that the trial court did not abuse its discretion in granting a permanent protective order in favor of Ms. Shaw and against Mr. Young. We further find that the trial court did not abuse its discretion in denying Mr. Young interim and permanent spousal support. Accordingly, we affirm the trial court’s May 6, 2015 judgment.
FACTS AND PROCEDURAL BACKGROUND
Mr. Young and Ms. Shaw married in January 2013. At that time, Ms. Shaw moved permanently from Australia to New Orleans, Louisiana, where the parties established their matrimonial domicile.
On February 13, 2014, Ms. Shaw filed a Petition for Protection from Abuse pursuant to the Louisiana Domestic Abuse Assistance Law, La. R.S. 46:2131, et 19seq. In the Petition, Ms. Shaw alleged that, on or about February 8, 2014, Mr. Young punched her, shoved her, and threatened her with bodily harm.
Based on the verified allegations in the Petition, on February 13, 2014, the trial court entered an ex parte Order of Protection against Mr. Young, effective through March 10, 2014 (“Temporary Restraining Order” or “TRO”). The Temporary Restraining Order prohibited Mr. Young from: (1) abusing, harassing, stalking, following, or threatening Ms. Shaw; (2) contacting Ms. Shaw personally, electronically, by phone, in writing, or through a third party, without the express written permission of the court; (3) going within 100 yards of Ms. Shaw without court permission; and (4) going within 100 yards of Ms. Shaw’s residence.
On or about May 9, 2014, Mr. Young filed a Petition for Divorce based on fault pursuant to La. Civ. Code art. 103, and requested a permanent injunction on the grounds of spousal abuse. Ms. Shaw filed an Answer and Reconventional Demand for Divorce and Permanent Injunction.
On October 14, 2014 and April 27, 2015, the district court held a two-day trial on Mr. Young’s Rule for Preliminary Injunction, Interim Spousal Support and Final Spousal Support; and Ms. Shaw’s Answer and Reconventional Demand for Divorce and Permanent Injunction.
At the conclusion of the trial on April 27, 2015, the district court issued a permanent Protective Order, which stated that Mr. Young was not to abuse, harass, stalk, follow, or threaten Ms. Shaw in any manner. The Protective Order further stated that “[f]or the purpose of this order, harassment includes, but is not limited lato, defendant’s written, verbal or electronic communication to 3rd parties disparaging petitioner.” The Protective Order also prohibited Mr. Young from contacting Ms. Shaw personally, electronically, by phone, in writing or through a third party. Mr. Young was also barred from going within 100 yards of Ms. Shaw or her residence, and he was ordered to stay away from Ms. Shaw’s place of employment/school and to not interfere with Ms. Shaw in any manner at her place of employment/school.
On May 6, 2015, the trial court signed a written judgment: (1) granting Ms. Shaw’s rule for divorce based on the parties having lived separate and apart continuously for 180 days; (2) granting Ms. Shaw a permanent protective order against Mr. Young, to be registered with the Louisiana Protective Order Registry; (3) denying Mr. Young’s rule for interim spousal support; (4) denying Mr. Young’s rule for final/permanent spousal support; and (5) *1183 granting Mr. Young a five year civil injunction against Ms. Shaw, prohibiting Ms. Shaw from “any and all harassments, including electronic means.”
Mr. Young timely appealed.
DISCUSSION
Permanent Protective Order Under the Louisiana Domestic Abuse Assistance Law
A trial court’s decision denying a protective order under the Domestic Abuse Assistance Law, La. R.S. 46:2181, et seq., is reversible only upon a showing of an abuse of discretion. Alfonso v. Cooper, 14-0145, p. 13 (La.App. 4 Cir. 7/16/14), 146 So.3d 796, 805. The trial court’s findings of fact, including its assessment of |4the weight of the evidence and the credibility of the witnesses, may not be set aside in the absence of manifest error or unless they are clearly wrong, Sander v. Brousseau, 00-0098, p. 3 (La.App. 4 Cir. 10/4/00), 772 So.2d 709, 710-11. When a conflict in the testimony exists, reasonable evalua tions of credibility and reasonable inferences of fact made by the trial court are not to be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are just as reasonable. Melerine v. O’Connor, 13-1073, p. 3 (La.App. 4 Cir. 2/26/14), 135 So.3d 1198, 1202. As long as the trier of fact’s findings are reasonable in light of the record as a whole, the appellate court will affirm. Mazzini v. Strathman, 13-0555, p. 4 (La.App. 4 Cir. 4/16/14), 140 So.3d 253, 256.
Under the Domestic Abuse Assistance Law, the trial court may grant a protective order directing the defendant to refrain from abusing, harassing, or interfering with the person on whose behalf a Petition for Protection from Abuse has been filed. La. R.S. 46:2136(A)(1); La. R.S. 46:2135(A)(1). To obtain a protective order under this statute, the petitioner must prove his or her allegations of domestic abuse by a preponderance of the evidence. La. R.S. 46:2135(B). “ ‘Proof is sufficient to constitute a preponderance of the evidence when the entirety of the evidence!,] both direct and circumstantial, shows that the fact sought to be proved is more probable than not.’” Joseph v. Williams, 12-0675, p. 23 (La.App. 4 Cir. 11/14/12), 105 So.3d 207, 222 (quoting Hanks v. Entergy Corp,, 06-477, p. 19 (La.12/18/06), 944 So.2d 564, 578).
On appeal, Mr. Young’s third assignment of error is that Ms. Shaw did not produce sufficient evidence to warrant a permanent protective order pursuant to La. R.S. 46:2136. Ms. Shaw argues that the evidence from the prior protective border proceedings, along with the evidence presented at the protective order proceedings at issue in this appeal, are sufficient to satisfy her burden of proof. Ms. Shaw is correct that evidence from prior protective order proceedings is admissible.
In this instance, however, we must decide whether evidence introduced at the prior protective order proceedings is properly before this court.
Under the Domestic Abuse Assistance Law, upon good cause shown in an' ex parte proceeding, the court may issue a temporary restraining order to protect a person who shows immediate and present danger of abuse. La. R.S. 46:2135(A). According to the statute, the court shall consider any and all past history of abuse, or threats thereof, in determining the existence of an immediate and present danger of abuse. La. R.S. 46:2135(A).
The February 13, 2014 Temporary Restraining Order was issued based solely on Ms. Shaw’s sworn allegations in her Peti *1184 tion for Protection From Abuse that, on or about February 8, 2014, Mr. Young punched her, shoved her, and threatened her with bodily-harm. In the Petition, Ms. Shaw alleged that when she tried to pack her belongings and move out of their residence, Mr. Young restrained her arm and leg in a painful hold, and then threatened to break her arm. Ms. Shaw stated that, as a result of the attack, she could not fully extend her arm for more than a week. Ms. Shaw claimed that in past incidents, Mr. Young had physically thrown her out of the house naked in the middle of the night, causing extreme bruising. She also alleged that he punched her in the mouth and nose.
The Domestic Abuse Assistance Law further provides that if the temporary restraining order is granted without a hearing, the matter shall be set for a rule to show cause why the protective order should not be issued, at which time the | (¡petitioner must prove the allegations of abuse by a preponderance of the evidence. La. R.S. 46:2135(B).
The record shows that in the February 13, 2014 TRO, the trial court ordered Mr. Young to show cause on March 10, 2014 (the date the TRO expired) why the TRO should not be made a protective order. Mr. Young states in his appellate brief that on or about April 14, 2014, the trial court held a hearing on Ms. Shaw’s allegations of physical domestic abuse, and entered a protective order against Mr. Young and in favor of Ms. Shaw. Ms. Shaw states in her brief that the trial court granted her an 18-month protective order against Mr. Young. The transcript of this April 2014 evidentiary hearing is not in the appellate record, nor is any written April 2014 protective order.[1]
We cannot consider any testimony or other evidence from the prior domestic abuse proceeding because this evidence is not in the record on appeal. Miccol Enters., Inc. v. City of New Orleans, 12-0864, p. 7 (La.App. 4 Cir. 12/19/12), 106 So.3d 746, 750. The trial court took judicial notice of the prior protective order proceedings, instead of allowing Ms. Shaw to repeat her prior testimony regarding physical domestic abuse. This, however, does not relieve Ms. Shaw of her obligation to designate in writing those portions of the record that she considers necessary to constitute the record on appeal in order to consider her argument. La.Code Civ. P. art. 2128; Uniform Rules, Courts of Appeal, Rule 2-1.17.
We now address whether the evidence introduced at the October 15, 2014 and April 27, 2015 trial was sufficient to satisfy Ms. Shaw’s burden of proving domestic abuse. At the April 27,. 2015 hearing, Ms. Shaw did not testify about any 17acts of physical abuse by Mr. Young. The only testimony regarding physical abuse came from Ms. Cinara, Cobb, a friend of Ms. Shaw who testified at the trial. Ms. Cobb stated that she first met Ms. Shaw on the night that Ms. Shaw “escaped from her home,” and that she saw bruises on Ms. Shaw’s arms and shoulder. Ms. Cobb admitted, however, that she did not see Mr. Young strike Ms. Shaw.
Ms. Shaw testified that, since the prior protective order was issued, Mr. Young had repeatedly harassed and threatened her and her friends. Ms. Shaw stated that she had only seen Mr. Young once, when she met Mr. Young on the street in the French Quarter. Ms. Shaw said that Mr. *1185 Young started screaming at her and her male companion, yelling that she was his wife and that “he was going to get the guy that [she] was out with if he ever saw him out with [her] again.”
Ms. Shaw also testified that Mr. Young had stolen money from her bank account using an old account number that she had given him. She stated that Mr. Young had sent threatening voice mail messages to her friends. She also testified that Mr. Young sent messages to her threatening to release private photographs of her to her friends and co-workers. According to Ms. Shaw, Mr. Young posted messages on his personal Facebook page that Ms. Shaw had broken into his house and was “illegally using the immigration system.” She stated that Mr. Young constantly sought out information about her from her friends. Ms. Shaw said that Mr. Young had posted photos on his Facebook page of people that she had been “out with,” and asked those people “who is this man she’s out with.” She testified that Mr. Young sent messages to everyone she used to know saying “bad things” about her, as well as saying “happy anniversary of you causing my marriage to break down.” She also stated that, on the day of the April 27, 2015 hearing, Mr. Young was still taunting her about a man she had formerly dated, and was “still Robsessed by [her].” Ms. Shaw testified that she was forced to move from her home because she was told by her friends that Mr. Young had been driving up and down her street. None of Ms. Shaw’s friends testified at trial other than Ms. Cobb. ■ According to Ms. Shaw, her friends were too afraid to testify on her behalf.
Cinara Cobb testified that when she and Ms. Shaw went out together in the French Quarter, they would have to leave places because of Ms. Shaw’s fear of Mr. Young, According to Ms. Cobb, Ms. Shaw told her, “We need to leave,” and “I don’t feel safe here now,” and “I’m afraid that he might show up.” Ms. Cobb also testified that Mr. Young posted her photographs on his Facebook page, even though she had never met him. She identified those photographs at trial when Ms. Shaw’s attorney pulled up Mr. Young’s public Facebook page on a cell phone. She also stated that Mr. Young had sent her Facebook messages, but she refused to “friend” him. Ms. Cobb testified that, she “absolutely” did not believe that Ms. Shaw was safe in New Orleans, and that Ms. Shaw’s friends told, her to move because they feared for her life.
At trial, both Mr. Young and Ms. Shaw testified that, during their marriage, Ms. Shaw was criminally convicted of domestic abuse against Mr. Young, and that a domestic abuse order was issued against Ms. Shaw, which she allegedly violated.[2] Ms. Shaw testified that after she was arrested, she was in jail for more than a week before getting bail, and that Mr. Young had threatened the bail bondsman, and told him that she was a flight risk and shouldn’t be> bailed out. She stated that Mr. Young posted “all over Facebook” that she was in jail. Ms. Shaw | testified that she was in constant fear that she would be arrested for something that she had. not done and that her name would be “besmirched” on-line.
Ms. Shaw testified that she felt she needed a- permanent protective order against Mr. Young because she lived in constant fear that, because of the physical violence in the past, as soon as there was not a protective order in place, the “harassment will step up and it won’t be *1186 just electronic harassment.” Ms. Shaw testified that she was so emotionally distressed that she was losing her hair, and that she had to cut herself off from her fifiends because she did not want Mr. Young to know anything about her. Ms. Shaw described her life as “very small” and “very difficult.”
Mr. Young’s testimony contradicted that of Ms. Shaw. He testified that when he met Ms. Shaw on the street with -a male companion, he simply said “Excuse me sir, that’s my wife.” He admitted that he posted several messages about Ms. Shaw on his Facebook page, but said they were just “general statements.” Mr. Young stated that the only time he contacted Ms. Shaw’s friends about getting in touch with her was to try to get her to collect her belongings. Mr. Young denied withdrawing money from Ms. Shaw’s bank account. Although Mr. Young admitted that he sent her a text message stating that he had “cleared out the account,” he stated that it was his account, not hers.
The. language of La. R.S. 46:2136, in effect at the time of the October 2014 and April 2015 trial, stated that “the court may grant any protective order or consent agreement to bring about cessation of abuse of a party.” La. R.S. 46:2136(A) (emphasis added).[3] At the time of the trial, “domestic abuse” was |indefined as “including, but not limited to, physical or sexual abuse and any offense against the person as defined in the Criminal Code of Louisiana, except negligent injury and defamation, committed by one family or household member against another.” La. R.S. 46:2132(3) (emphasis added).[4]
The Criminal Code’s “offenses against the person” are found in Part II of Title 14, beginning with La. R.S. 14:29 (homicide), and ending with La. R.S. 14:50.2 (crimes of violence against victims 65 years old or older).[5]
Under- the Domestic Abuse Assistance Law, both before and after the August 2015 revisions, the standard of abuse includes' “any offense against the person” as defined by the Louisiana Criminal Code. Under this standard, “Family arguments that do not rise to the threshold of physical or sexual abuse or violations of the criminal code are not in the ambit of the *1187 Domestic Abuse Assistance Statute.” Harper v. Harper, 537 So.2d 282, 285 (La.App. 4th Cir.1988). Each case must be reviewed individually. Id.
We find that two “offenses against the person” in the Criminal Code are pertinent to Ms. Shaw’s allegations of domestic abuse involving non-physical | ¡ ¡threats and harassment. The crime of stalking is set forth in La. R.S. 14:40.2(A): “Stalking is the intentional and repeated following or harassing of another that would cause a reasonable person to feel alarmed or to suffer emotional distress.” The term “harassing” is defined as “the repeated pattern of verbal communications or nonverbal behavior without invitation which includes but is not limited to making telephone calls, transmitting electronic mail, sending messages via a third party, or sending letters or pictures.” La. R.S. 14:40.2(0(1) (emphasis added). A “pattern of conduct” means “a series of acts over' a period of time, however short, evidencing an intent to inflict a continuity of emotional distress upon the person.” La. R.S. 14:40.2(0(2).
Ms. Shaw testified that Mr. Young posted messages to her threatening to release private photographs of her to others. She also said that Mr. Young sent messages to her friends saying “bad things” about her, messages which the friends then forwarded to her. Ms. Shaw stated that, because of this harassment, she lived in constant fear of Mr. Young, she lost her hair, and she became isolated from her friends.
Ms. Shaw did not specifically state that these were electronic messages, although she did testify that there was “electronic harassment.” We find that these messages — whether they were e-mails, text messages, or even letters — constitute a “repeated pattern of verbal communications or nonverbal behavior without' invitation” that would cause a reasonable person to feel alarmed or to suffer emotional distress.
Because these acts by Mr. Young constitute harassment within the meaning of the stalking statute, La. R.S. 14:40.2, they also constitute domestic abuse pursuant to La. R.S. 46:2136.
I ¡Another “offense against the person” found in the Louisiana Criminal Code is the crime of cyberstalking, which is set forth in La. R.S. 14:40.3:
(B) Cyberstalking is action of any person to accomplish any, of the following: ...
(2) Electronically mail or electronically communicate to another repeatedly, whether or not conversation ensues, for the purpose of threatening, terrifying or harassing any person.
La. R.S. 14:40.3(B)(2).
The cyberstalking statute defines “electronic communication” as “any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature, transmitted in whole or in part by wire, radio, computer, electromagnetic, photoelectric, or photo-optical system.” La. R.S. 14:40.3(A)(1). The statute also defines “electronic mail” as the “transmission of information or communication by use of the Internet, a computer, a facsimile machine, a pager, a cellular telephone, a video recorder, or other electronic means sent to a person identified by a unique address or address number and received by that person.” La. R.S. 14:40.3(A)(2). As with the stalking statute, any harassing e-mails and text messages from Mr. Young would constitute cyberstalking.
Ms. Shaw testified that Mr. Young posted messages on his Facebook page that *1188 Ms. Shaw had broken into his house.[6] She stated that he also posted Facebook | ^messages that she was “illegally using the immigration system,” communications that relate to Ms. Shaw’s testimony regarding her immigration problems. She said he also posted photographs on his Facebook page of people she had dated and asked who they were, communications that relate to Ms. Shaw’s testimony about Mr. Young’s threatening confrontation with her and her male companion in the French Quarter.
At trial, Mr. Young testified that his Facebook account was private and that he didn’t intend for any of his messages to reach Ms. Shaw. By default, Facebook pages are public. See State v. Craig, 167 N.H. 361, 369, 112 A.3d 669, 664 (2015). Facebook users can restrict access to their Facebook content using Facebook’s customizable privacy settings. Id, Access can be limited to the user’s Facebook friends, to particular groups, or individuals, or to just the user. Id. Ms. Cobb testified at trial that she did not know Mr. Young and that he was not her Facebook “friend.” During Ms. Cobb’s testimony, she used a cell phone to look at photographs of herself that were posted on Mr. Young’s personal Facebook page.[7] Because Ms. Cobb’s photographs could be located by a stranger simply by entering Mr. Young’s name in the Facebook search tool, Mr. Young’s Facebook account obviously did not have privacy settings. Such public information about Ms. Shaw, therefore, was available to anyone, even to people without an account on Facebook. Id.
Under the cyberstalking statuté, the following action is an offense: Electronically communicating “to another” “repeatedly” “for the purpose of | ^threatening ... or harassing any person.” La. R.S. 14:40.3(B)(2) (emphasis added). The offense is deemed to have been committed where the electronic communication was “originally sent, originally received, or originally viewed by any person.” La. R.S. 14:40.3(D) (emphasis added). Thus, the receipt or review of a threatening or harassing electronic communication by a friend of the victim is deemed to be cyber-stalking. The cyberstalking statute, therefore, does not require that the electronic communication be transferred or transmitted directly to the victim.
*1189 Here, Mr. Young composed and posted messages about Ms. Shaw that everyone on Facebook could see, including Ms. Shaw and her friends. There was no reason for Mr. Young to post these messages about Ms. Shaw other than to communicate them to Ms. Shaw or to other Facebook users, who then might convey the messages to Ms. Shaw. Under these circumstances, we find that Mr. Young’s postings about Ms. Shaw on his personal Facebook page are “electronic communications” (defined by the cyberstalking statute as any “writing” or “images” which are “transmitted in whole or in part” by “computer”) transmitted for the purpose of harassing Ms. Shaw. See La. R.S. 14:40.3(A)(1), (B)(2).[8] Thus, Mr. Young’s harassing,Facebook postings about Ms. Shaw constitute domestic, abuse under the Domestic Abuse Assistance Law.[9]
l1KIt is not necessary for this court to decide whether or not a criminal conviction for stalking or cyberstalking could have been sustained under these facts. We need only decide whether Ms. Shaw satisfied her burden of proving her allegations of domestic abuse by a preponderance of the evidence. The trial court’s issuance of the Permanent Protective Order was based on a credibility determination. The trial court found the testimony of Ms. Shaw and Ms. Cobb regarding Mr. Young’s threats and harassment more credible than the testimony of Mr. Young. The evidence supports a finding that Mr. Young’s repeated messages and postings were for no other reason than to harass Ms. Shaw, particularly in light of the earlier Temporary Restraining Order, which prohibited Mr. Young from abusing, harassing, stalking, following, or threatening Ms. Shaw “in any manner,” and prohibiting him from contacting Ms. Shaw “electronically.”
Mr. Young contends that, although Ms. Shaw testified about harassing and threatening text messages and Facebook postings, she did not introduce these into evidence. Even though copies of the actual messages and postings were not introduced at .trial, the trial court concluded that there was sufficient evidence that Mr. Young committed acts of domestic abuse so as to justify a permanent protective order. We find no abuse of discretion.
Accordingly, we affirm the trial court’s judgment granting a permanent protective order against Mr. Young and in favor of Ms. Shaw. .
Interim Spousal Support and Final/Permanent Spousal Support
The trial court is vested with much discretion in determining awards of spousal support. Molony v. Harris, 09-1529, p. 2 (La.App. 4 Cir. 10/14/10), 51 So.3d 752, 756. “Such determinations will not be disturbed absent abuse of discretion.” Id.
hfiThe Civil Code provisions governing spousal support are found in Articles 111, 112, and 113. Article 111 provides as follows:
*1190 In a proceeding for divorce or thereafter, the court may award interim periodic support to a party or award final periodic support to a party who is in need of support and who is free from fault prior to the filing of a proceeding to terminate the marriage in accordance with the following Articles.
La. Civ.Code art. 111.

Interim Spousal Support: Article 113

The trial court denied Mr. Young’s request for interim spousal support based on its findings that although the parties enjoyed a higher standard of living while they were married, since their separation, Ms. Shaw experienced a reduction in income so that she did not have the ability to pay interim spousal support.
In Mr. Young’s first assignment of error, he argues that the trial court erred in denying him interim spousal support because he provided adequate evidence that he needed financial support from Ms. Shaw, and that Ms. Shaw had the ability to pay.
Article 113 governs an award of interim spousal support:
[T]he court may award a party an interim spousal support allowance based on the needs of that party, the ability of the other party to pay, any interim allowance or final support obligation, and the standard of living of the parties during marriage, which award of interim spousal support allowance shall terminate upon the rendition of a judgment of divorce.
La. Civ. Code art. 113.
“ ‘If a spouse has not sufficient income for maintenance pending suit for divorce, the judge may allow the claimant spouse, whether plaintiff or defendant, a sum for that spouse’s support, proportioned to the needs of the claimant spouse and the means of the other spouse.’ ” Koeniger v. Koeniger, 08-1054, p. 2 (La.App. 4 Cir. 3/4/09), 10 So.3d 271, 272 (quoting Pellerin v. Pellerin, 97-2085, p. 10 (La.App. 4 Cir. 6/17/98), 715 So.2d 617, 622).

Evidence for Determining Income for Spousal Support

La. R.S. 9:326 governs the evidence required for a determination of income for spousal support:
Each party shall provide to the court a verified income statement showing gross income and adjusted gross income, together with documentation of current and past earnings. Suitable documentation of current earnings shall include but not be limited to pay stubs or employer statements. The documentation shall include a copy of the party’s most recent federal tax return.
Mr. Young’s Need: Income and Expenses
Mr. Young bears the burden of proving that he lacks sufficient income, or the ability to earn a sufficient income, to maintain the standard of living that he enjoyed during his marriage. Koeniger, 08-1054 at pp. 2-3, 10 So.3d at 272.
Ms. Shaw testified that Mr. Young worked sporadically during their marriage. She stated that between January and September 2013, Mr. Young did small jobs such as body piercing and hosting at a restaurant, earning about $200.00 or $300.00 per week. She testified that in September 2013, Mr. Young began earning $2,000.00 to $3,000.00 per month. According to Ms. Shaw, during the marriage, she supported about 80% of Mr. Young’s lifestyle, not from her income, but from her savings that she had acquired during the past four or five years.
At the October 15, 2014 hearing, Mr. Young agreed with Ms. Shaw that she *1191 made most of the income during their marriage. Mr. Young produced no documentary evidence of any income at all in 2013. Mr. Young testified that during their marriage he earned about $2,000.00 per month. To support this testimony, he introduced a single pay stub dated July 9, 2014, in which he earned [ 18$1,9-35.00. Mr. Young did not introduce a copy of his most recent 2014 federal tax return, as required by La. R.S. 9:326. At the October 15, 2014 hearing, Mr. Young stated that he had not worked since August 2014, when he was involved in a serious motorcycle accident. Mr. Young introduced a statement of his current income and expenses, which showed that he was earning no income, and had total monthly expenses of $1,915.00. The statement also showed that Mr. Young had an outstanding loan of $20,000.00 and $78,000.00 in medical bills.
This evidence shows that Mr. Young did not have sufficient income for maintenance pending the suit for divorce. Even where a claimant has demonstrated need, however, a payor spouse’s inability to pay precludes an award of interim spousal support to the claimant spouse. Molony, 09-1529 at p. 11, 53 So.3d at 761. We must, therefore, also examine Ms. Shaw’s expenses.
Ms. Shaw’s Ability to Pay: Income and Expenses
The ability of the spouse to pay interim spousal support exists if money remains after all monthly expenses have been paid. Molony, 09-1529 at p. 11, 51 So.3d at 761.
Ms. Shaw testified that in the year prior to her marriage in January 2013, she earned about $48,000 in U.S. dollars while permanently employed in Australia.[10] Ms. Shaw testified that she was laid off by her Australian employer in March 2013, two months after her marriage. Ms. Shaw said that she was unable to find work between March and October 2013 because she was waiting for her provisional green card, which would have given her the right to work in the U.S.
At the April 27, 2015 hearing, Ms. Shaw produced a copy of her 2013 U.S. federal income tax return, in which she reported adjusted gross income of |1n$12,390.00 in 2013.[11] Ms. Shaw introduced evidence at trial showing that on April 4, 2013, she received a one-time, lump-sum “employment termination payment” of $19,385.00 from her former employer, which is about $14,539.00 in U.S. dollars. This documentary evidence shows that in 2013, Ms. Shaw had a total income of approximately $27,000.00.
In accordance with La. R.S. 9:326, Ms. Shaw produced a copy of her most recent 2014 federal tax return, in which she reported adjusted gross income of $14,186.00.[12] At trial in April 2015, Ms. *1192 Shaw testified that she currently was earning about $1,000 per month. She also testified that she was working an average of only six or seven days a month doing “sporadic” consulting work for clients in Australia. She said that there are “about three months of the year where there is little or no work,” Ms. Shaw testified that she could obtain only “low level, ad hoc, last minute” work. She said that she had difficulty finding work because she did not have experience working in the United States, and that the type of work she does is not found in New Orleans.[13] She also stated that she was unable to return to Australia to work temporarily because of the conditions on her green card, which might prevent her from returning to the United States.
| 2qMs. Shaw testified that her current monthly expenses were $780.00, which included $367.00 in rent for an apartment that she shared with a roommate. . She introduced copies of her lease agreement, and her telephone and cable television bills’ Ms. Shaw also introduced a state-meht showing additional expenses that included electricity, water, internet, storage, legal and court fees, and court-ordered counseling, which totaled $21,015.46 between February 2014 and March 2015. This figure averages about $1,400.00 per month. Ms. Shaw testified that she had to borrow more than $20,000.00 from family and friends in Australia to pay her expenses, and that this loan had to be repaid.
Based on the evidence presented at trial, after the parties separated in February 2014, Ms. Shaw was not earning enough income to pay her monthly expenses, much less pay Mr. Young interim spousal support. Accordingly, we find that it was within the trial court’s discretion to deny Mr. Young an award of interim spousal support based solely on the evidence of Ms. Shaw’s inability to pay, irrespective of Mr. Young’s need.

Permanent Spousal Support: Article 112

The trial court denied Mr. Young’s request for permanent spousal support because neither party appeared to be in a position to pay spousal support, and both parties appeared to be equally in need. In deciding the issue of permanent spousal support, the trial court stated that it would not rule on fault.
In Mr. Young’s second assignment of error, his sole argument is that the trial court failed to consider evidence of Ms. Shaw’s fault in determining whether to award him permanent spousal support.
- Louisiana Civil Code Article 112 governs the award of permanent spousal support:
121 A. When a spouse has not been at fault and is in need of support, based on the needs of that party and the ability of the other .to pay, that spouse may be awarded final periodic support in accordance, with Paragraph B of this Article.
B. The court shall consider all relevant factors in determining the amount and duration of final support. Those factors may include:
1) The income and means of the parties, including the liquidity of such means.
2) The financial obligations of the parties.
3) The earning capacity of the parties.
4) The effect of custody of children upon a party’s earning capacity.
5) The time necessary for the claimant to acquire appropriate education, training, or employment.
*1193 6) The health and age of the parties.
7) The duration of the marriage.
8) The tax consequences to either of the parties.
C. The sum awarded under this Article shall not exceed one-third of the obli-gor’s net income.
La. Civ. Code art. 112.
Under Article 112, a claimant may be entitled to permanent spousal support if the claimant is free from fault and is in need of support, and the other spouse has the ability to pay. Schmitt v. Schmitt, 09-0415, p. 3 (La.App. 4 Cir. 12/16/09), 28 So.3d 537, 539-40. Thus, “freedom from fault” is a prerequisite to' a former spouse’s claim for permanent spousal support. Id. at p. 3, 28 So.3d at 540. Mr. Young, as the claimant, has the burden to “affirmatively prove” his freedom from fault. Id. It is not enough for Mr. Young to prove Ms. Shaw was at fault. Sciortino v. Sciortino, 99-3117, p. 9 (La.App. 4 Cir. 11/8/00), 773 So.2d 240, 246.
IsaAt the October 15, 2014 hearing, counsel for Mr. Young told the court that “we’re not prepared for a fault hearing.” During the second and final day of the trial on April 27, 2015, when the trial court stated that it would not rule on fault, counsel for Mr. Young did not object, even though Mr. Young had the burden of “affirmatively” proving that he was free from fault in order to obtain permanent spousal support. Although this omission raises the issue of waiver, we will nonetheless examine the trial court’s ruling for legal 'error.
A legal error occurs when a trial court prejudicially applies incorrect principles of law such that it materially affects the outcome of the case, and deprives a party of substantial rights. 1100 S. Jefferson Davis Parkway, LLC v. Williams, 14-1326, p. 3 (La.App. 4 Cir. 5/20/15), 165 So.3d 1211, 1215.
The trial court found that Mr. Young was not entitled to an award of permanent spousal support based solely on Ms. Shaw’s inability to pay, which involves an examination of several of the financial factors listed in La. Civ. Code art. 112: (1) the income and means of the parties; (2) the financial obligations of the parties; and (3) the earning capacity of the parties. “The principal factor to be considered in determining a spouse’s entitlement to permanent alimony is the relative financial positions of the parties.” Vincent v. Vincent, 11-1822, p. 19 (La.App. 4 Cir. 5/30/12), 95 So.3d 1152, 1164, n. 2.
At the time of trial, Ms. Shaw had a low monthly income, high monthly expenses that exceeded her income, $20,000.00 in loan debt, and á diminished earning capacity based on her specialized job skills and immigration status. These circumstances support the trial court’s finding that Ms. Shaw did not have the financial ability to pay Mr. Young permanent spousal support. Thus, even if the l^trial court had considered evidence that Mr. Young was free from fault, this would not have changed the outcome or deprived Mr. Young of substantial rights.
Accordingly, we find that the trial court did not abuse its discretion in denying Mr. Young permanent spousal support.
CONCLUSION
We decide that the crimes of stalking and cyberstalking constitute domestic abuse for the purpose of obtaining a protective order under the Louisiana Domestic Abuse Assistance Law. On that basis, we find that the trial court did not abuse its discretion in granting a permanent protective order in favor of Ms. Shaw and against Mr. Young. We also find that the trial court did not abuse its discretion in *1194 denying Mr. Young interim and permanent spousal support.
AFFIRMED

. The only transcripts designated by Mr. Young were those from the October IS, 2014 and April 27, 2015 hearings.

. This testimony supported the trial court's judgment granting Mr. Young a five year civil injunction against Ms. Shaw, which she did not appeal.

. Effective August 1, 2015, the legislature amended La. R.S. 46:2136(A) as follows: "The court may grant any protective order or approve any consent agreement to bring about a cessation of domestic abuse as defined in R.S. 46:2132(3), or the threat or danger thereof, to a party.” The highlighted language shows the additions to La. R.S. 46;2136(A).

. Effective August 1, 2015, the legislature also amended La. R.S. 46:2132(3) as follows: “ 'Domestic abuse’ includes but is not limited to physical or sexual abuse and any offense against the person, physical or non-physical, as defined in the Criminal Code of Louisiana.” The highlighted language shows the additions to the language of La. R.S. 46:2132(3).

. We note that in D.M.S. v. I.D.S., 14-0364 (La.App. 4 Cir. 3/4/15), — So.3d -, 2015 WL 926777, writ denied, 15-0897 (La.6/19/15), 172 So.3d 654, application for reconsideration not considered, 15-0897 (La.8/28/15), 174 So.3d 1160, the court declared that "[t]his court and others have held that the definition of domestic abuse in La. R.S. 46:2132(3) does not incorporate nonphysical acts.” Id. at p. 15, 2015 WL 926777 at *7. The DM.S. opinion (and the cases it cited) involved allegations of violent behavior and, as such, this statement is dicta. City of New Orleans v. Bd. Of Comm’rs of Orleans Levee Dist., 93-0690, p. 37 (La.7/5/94), 640 So.2d 237, 257 (discussion of issue not essential to the holding is obiter dicta, and is not binding). The DM.S. court also was not considering crimes such as stalking and cyber-stalking, which are "offenses against the person as defined in the Louisiana Criminal Code,” but are non-physical acts. See infra.

. The various means of communicating on Facebook are well summarized in Ehling v. Monmouth-Ocean Hosp., 961 F.Supp.2d 659, 662 (D.N.J.2013):
Facebook provides users with several means of communicating with one another. Users can send private messages to one or more users. Users can also communicate by posting information to their Facebook '‘wall,’' which is part of each user’s Profile Page, A Facebook “wall post” can include written comments, photographs, digital images, videos, and content from other websites. To create a Facebook wall post, users upload data from their computers or mobile devices directly to the Facebook website. Facebook then saves that data onto its computers (called "servers”). New wall posts are typically distributed to a user’s Face-book friends using the News Feed feature. Users’ most- recent wall posts also appear at the top of their Profile Pages. A user's Facebook friends can comment on the wall posts, indicate that they "like” the wall posts, or share the posts with other users. Facebook users typically do not post information to their Facebook walls with the intent to delete it later. Instead, Facebook designed its website so that its servers would save this data indefinitely. As more and more wall posts are added, earlier wall posts move lower and lower down on the user’s Profile Page, and are eventually archived on separate pages that are accessible, but not displayed.

. It should be noted that the trial court asked - Ms. Cobb to pull up her photographs on the cell phone, and that Mr. Young’s counsel objected.

. As stated by another court addressing this same issue, "Such an interpretation reflects the legislature’s awareness that technological advances in communication including e-mail and social media websites such as Face-book — provide a fertile environment for criminal behavior and that 'sometimes, particularly in stalking and harassment cases, social media facilitates the crime.' ” Craig, 167 N.H. at 372, 112 A.3d at 566.

. See Laurie L. Baughman, Friend Request or Foe? Confirming the Misuse of Internet and Social Networking Sites by Domestic Violence Perpetrators, 19 Widener L.J. 933 (2010) (discussing how Internet and social media users who are victims of domestic violence may be vulnerable to further abuse or may experience harassment or stalking through these social networking mediums).

. Ms. Shaw testified that an Australian dollar equals about .75 of a U.S. dollar.

. With respect to Ms. Shaw's 2013 income, Mr. Young introduced into evidence three pay stubs from Ms. Shaw’s work for an Australian company between January 2, 2013 and February 15, 2013, the two months before Ms. Shaw was laid off. The pay stubs show that Ms. Shaw earned a total net pay of $7,014.56 for those two months. Ms. Shaw also introduced into evidence copies of November 2013 and December 2013 invoices that she prepared and sent to an Australian client, which totaled $2,485.00. These paystubs and invoices show that Ms. Shaw earned about $9,500.00 in Australian dollars, or about $7,125.00 in U.S. dollars. We will use the higher income figure shown on her U.S. tax return.

.The invoices that Ms. Shaw sent to her Australian client totaled $12,045.00 (about $9,034.00 in U.S. dollars) in 2014. We will use the higher income figure shown on her 2014 U.S. tax return.

. Ms. Shaw's ■ resume states that she is a specialist in senior human resources, change management and business intelligence for blue chip organizations in IT and financial services.