Judgment rendered September 25, 2019.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 52,879-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

ELIZABETH S. LARREMORE                    Plaintiff-Appellee

versus

KELLY D. LARREMORE                        Defendant-Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 610823

Honorable Roy L. Brun, Judge

* * * * *

ALAN PESNELL, LLC                         Counsel for Appellant
By: W. Alan Pesnell

KAMMER & HUCKABAY, LTD.                    Counsel for Appellee
By: Charles H. Kammer, III

ROBERT I. THOMPSON, III

RONALD J. MICIOTTO

* * * * *

Before GARRETT, STONE, and COX, JJ.

**GARRETT, J.**

Kelly D. Larremore appeals from a protective order issued against him and in favor of his former wife, Elizabeth S. Larremore, and their three minor children. We affirm the trial court judgment.

## FACTS

The Larremores separated in January 2015 and divorced in May 2016. Elizabeth has sole custody of the children. According to an interim order by consent, which was signed August 20, 2015, Kelly was required to undergo drug and alcohol testing weekly and/or immediately prior to any visitation with the children.[1]

On August 17, 2018, Elizabeth filed against Kelly a verified "petition for protection from stalking or sexual assault," in which she marked as applicable 13 of the 17 specified behaviors under the "Stalking" section.[2] These included the following: harassment; uninvited presence at protected person's home, workplace, and school; messages by telephone, texts, email or other electronic means and posting on social media; stalking; threats of bodily injury or to the protected person's life; and threats with a dangerous weapon. Elizabeth filed the petition on behalf of herself and the children.

Elizabeth attached a three-page personal statement in which she recounted a recent escalation of disturbing behavior by Kelly. These incidents included him coming to her house late at night; harassing her by

---

[1] According to Elizabeth's trial testimony, Kelly has not had visitation with the children since this court order because he has not produced evidence of compliance with the testing requirement.

[2] Elizabeth, appearing in proper person, filled out this standardized form, which stated in its caption that it was "[p]ursuant to La. R.S. 46:2171 et seq. [Protection from Stalking Act, which addresses stranger and acquaintance stalking] or La. R.S. 46:2181 et seq. [Protection for Victims of Sexual Assault Act]." She specified that the defendant was an acquaintance, as opposed to a stranger.

emails and texts to the point of Kelly being arrested for cyberstalking; and using social media to attack her, her relatives, her employees, and her friends. She stated that she and the children left town for several weeks during the summer "so he could not stalk me or harass me in person." Elizabeth asserted that she feared for her life and the well-being of her children. She further described the "social and emotional repercussions" being suffered by the children due to their father's "increasingly erratic behavior" and his "constant fixation" with her. She stated that the children, who have been in counseling for four years, fear for her life as the result of an incident during the marriage in which Kelly held a loaded gun to her head in their presence and threatened to "blow [her] brains out." Elizabeth asserted that Kelly's recent actions had "reopened that trauma" for the children. She also contended that Kelly had been following their oldest child while the child was driving and emailing her about the child's driving habits.

Other concerns cited in Elizabeth's statement were Kelly's recent social media posts, in which he accused her of being "a danger to the children, a criminal, a drug addict" and having mental problems. She noted the public nature of these posts and the issues they have caused for the children. One consequence has been that the children's friends are no longer allowed by their parents to stay at Elizabeth's house because the parents fear Kelly "might do something that would endanger their children." Elizabeth asserted that Kelly consistently refuses to comply with court orders because "he believes he is above the law." Elizabeth also attached more than 80 pages of photos, texts and social media posts by Kelly which contained attacks against her, her business, and members of her family.

2

Elizabeth requested that an ex parte temporary restraining order be immediately issued prohibiting Kelly from (1) abusing, harassing, assaulting, stalking, following, tracking, monitoring, or threatening her and the children; (2) contacting her and the children personally, through third parties or via public posting, by any means, including verbal, written, telephone or electronic communication; (3) going within 100 yards of their residence; and (4) contacting their family members or individuals with whom they are acquainted. She also requested that he be ordered to stay away from her place of employment and the children's schools. Finally, she sought a rule to show cause why the orders requested should not be made into protective orders and why Kelly should not be cast for costs.

On August 20, 2018, the trial court signed the ex parte temporary order of protection, which designated Elizabeth and the children as "protected persons." The court found that the allegations presented constituted an immediate and present danger (1) to the physical safety of the protected persons and (2) of stalking. The matter was set for a hearing on August 29, 2018, the date the order was scheduled to expire.

On August 28, 2018, Kelly's attorney filed a motion to continue the hearing on the grounds that he had inadequate time to prepare. On August 29, 2018, Kelly filed an opposition to the petition, in which he denied stalking of any kind and argued that Elizabeth's petition sought to interfere with his first amendment rights of free speech and association. He also filed a peremptory exception of no right of action and no cause of action. There are notations on the proposed orders attached to these pleadings that they were deemed moot by the trial court; the ones for the

exception and the opposition stated that they were handled at the August 29, 2018 hearing.

The appellate record does not contain a transcript of the August 29, 2018 hearing; apparently, a recording of the hearing could not be located and transcribed. However, on September 28, 2018, Elizabeth filed a "motion to codify an interim order of protection until a final judgment can be put in place." In this motion, she asserted that, at the hearing, counsel for both parties stipulated into the record an order of protection in her favor and against Kelly and that the trial court verbally informed Kelly that the order was immediately in effect and binding upon him. She alleged that the parties were unable to agree on form and content. At Elizabeth's request, the trial court signed an interim order of protection, retroactive to August 29, 2018, which incorporated an attached order of protection, and directed the parties to submit a final order within seven days of the order. The attached order of protection was issued pursuant to La. R.S. 46:2131 et seq., and was effective until August 29, 2020. It named Elizabeth as the protected person and contained the same prohibitions as the initial order of protection.

On November 15, 2018, Kelly filed a motion requesting that the trial court fix a hearing on the merits of the protective order. He asserted that the "attempted agreement" could not be reduced to writing because there was no record or tape of the proceedings. He stated that the matter needed "to be re-set as soon as possible." On November 16, 2018, Elizabeth filed a motion to reset the protective order hearing and for attorney fees.[3] Both matters were set for hearing on December 5, 2018.

---

[3] On November 16, 2018, Elizabeth also filed a motion for contempt, in which she alleged that Kelly had violated the provision of the protective order directing him to stay

4

On November 26, 2018, Kelly filed a "motion to terminate interim order and replace with temporary restraining order." He claimed that, due to the lack of a hearing transcription, there was no compromise, and the interim order of protection was "imperfect." There is a notation, "file into record unsigned," on the attached order to show cause.

On December 5, 2018, Kelly failed to appear at the hearing which he had requested. His absence was not explained. His attorney reurged his exception as to the initial protective order, which Elizabeth sought on her own, being premised on the stranger and acquaintance stalking statute, La. R.S. 46:2171 et seq. However, the parties agreed to proceed under the Domestic Abuse Assistance Act, La. R.S. 46:2131 et seq.[4]

Elizabeth testified about her relationship with Kelly. She described the history of Kelly's substance abuse and the domestic violence she suffered during the marriage, which served as a backdrop for Kelly's current actions.[5] Of particular interest was her testimony about an incident shortly before their January 2015 separation in which Kelly placed a gun to Elizabeth's head and threatened to kill her in the presence of their three young children. She further testified that Kelly continued to act violently and erratically after the separation and the divorce. Elizabeth described an incident in 2016 when Kelly inflicted $3,000 worth of damage to her car in a

_____

100 yards away from her. However, the record suggests that service of this pleading was not made prior to the hearing on December 5, 2018, at which time Kelly's attorney accepted service in court.

[4] When the trial court suggested proceeding under this act, Kelly's counsel stated, "If the ruling is that we proceed today under the domestic abuse statute, I mean, that's fine." No objection was made to so proceeding.

[5] Elizabeth testified that she required seven staples in her head after Kelly knocked her unconscious by shoving her into a dresser and, on the day of their children's baptisms, she underwent an MRI to determine if he had shattered her eye socket when he shoved her down on a brick floor.

restaurant parking lot and then came inside and announced to her in front of other diners, "By the way, Bitch, I just fucked up your new car." She testified that Kelly has come to her house repeatedly and threatened her in front of their children.

According to Elizabeth, Kelly's behavior began to escalate recently. She stated that he began emailing her incessantly and making "horrible" posts about her and her family. He moved into a house which was about half a mile from her residence. Beginning in April 2018, Kelly would drive by her house every night, beat on the front door, and demand to see the children. As a result, she installed a security system with cameras. She recounted one particular incident, which occurred on July 15, 2018, when he came to the house, made a "gun shooting" motion, kicked the door, and threatened to kill her. This incident, which was recorded by the security system, precipitated her filing for the protective order.

Testimony was also provided by two Shreveport police officers, who described responding to calls involving Elizabeth and/or Kelly on July 15 and 16, 2018. These events culminated in Kelly's involuntary commitment at the LSU Medical Center on July 16, 2018, approximately one month before Elizabeth filed for the protective order.

Sergeant Anthony Sutis testified that on July 15, 2018, he responded to a call at Elizabeth's house. He said she was distraught because Kelly had been to her house in violation of a divorce-related injunction. She told him she had video of Kelly from her security system, but he testified that he did not believe he viewed the video that night. Elizabeth also said Kelly had

6

been driving past her house.[6] Sergeant Sutis testified that, as he pulled up to Elizabeth's house, he saw a truck driven by a male go by but was unable to get its license plate number. However, according to his testimony, it "closely matched" a truck he saw at Kelly's residence when he responded to a welfare check there later that same night. He testified that the welfare check was initiated by Kelly's current wife, Jennifer, who was concerned about Kelly's behavior when he left the residence. Sergeant Sutis testified that he spoke to Jennifer when she answered the door. Kelly, who had returned home and appeared to have been sleeping, came to the door and told Sergeant Sutis that he was distraught because he had not seen his kids in a couple of years. Although Kelly appeared to be upset, he denied intending to harm himself or anyone else. Sergeant Sutis testified that, based on the information they had from the contacts at both residences, it was deemed the best course of action was to write up a report and forward it to investigators for further action.

Corporal Charles Person testified he responded to a call at Kelly's residence on July 16, 2018, which involved Kelly burning a purse belonging to Jennifer in the kitchen. Kelly told Corporal Person that he burned the purse because it was his and he wanted to. Corporal Person observed ice had been thrown on the burners in the kitchen and that Kelly was in his underwear. However, the purse could not be located.

Sergeant Sutis also testified about this incident. He said he was the last officer to arrive on scene; three other officers were there. As he was

_____

[6] Elizabeth testified that she lives on a street which is horseshoe-shaped and that Kelly had no reason to be on it. Sergeant Sutis' testimony on cross-examination established that Kelly did not need to drive directly in front of Elizabeth's house to leave the subdivision where they both lived.

arriving, Jennifer was leaving in her vehicle. He recognized her and stopped her. According to Sergeant Sutis, she was upset but said her main concern was her dog. She returned to the house, where Kelly was being detained in his bedroom. After contacting his officers, Sergeant Sutis talked to Jennifer, who again said her dog was her main concern. She also told him that she did not want to leave the residence; instead, she wanted Kelly to leave. After Sergeant Sutis talked to Kelly, it was determined that he should be taken to LSU Medical Center for an emergency commitment.

At the conclusion of the evidence, the trial court specifically found the witnesses "testified credibly and truthfully in all matters" and that the evidence was sufficient to require issuance of the requested protective order. It assessed costs against Kelly. It additionally awarded attorney fees against Kelly and stated that, if the attorneys could not work out the amount, another hearing would be held.

The trial court then executed and signed the protective order which named Elizabeth and the children as protected persons. It prohibited Kelly from (1) abusing, harassing, assaulting, stalking, following, tracking, monitoring, or threatening them, or (2) contacting them "personally, through a third party, or via public posting, by any means, including written, telephone, or electronic (text, email, messaging, or social media) communication." Kelly was ordered to stay 300 yards from them and their residence. He was also ordered to stay away from Elizabeth's businesses and the children's schools. Kelly was ordered to pay all court costs and the attorney fees, which were to be set. This order was transmitted to the Louisiana Protective Order Registry.

**PROTECTIVE ORDER**

Kelly appealed and argues that the trial court erred in granting the protective order.

*Law*

As previously noted, the parties agreed at the hearing to proceed under the Domestic Abuse Assistance Act, La. R.S. 46:2131 et seq. It provides a civil remedy for domestic violence which will afford the victim immediate and easily accessible protection. La. R.S. 46:2131.

La. R.S. 46:2132(3) states that domestic abuse "includes but is not limited to physical or sexual abuse and *any offense against the person, physical or non-physical, as defined in the Criminal Code of Louisiana*, except negligent injury and defamation, committed by one family member, household member, or dating partner against another." (Emphasis added.) The phrase "physical or non-physical" was added to this definition by Acts 2015, No. 85.[7]

In relevant part, La. R.S. 46:2135 states:

A. Upon good cause shown in an ex parte proceeding, the court may enter a temporary restraining order, without bond, as it deems necessary to protect from abuse the petitioner, any minor children, or any person alleged to be an incompetent. Any person who shows immediate and present danger of abuse shall constitute good cause for purposes of this Subsection. *The court shall consider any and all past history of abuse, or threats thereof, in determining the existence of an immediate and present danger of abuse. There is no requirement that the abuse itself be recent, immediate, or present.* The order may include but is not limited to the following:

(1) Directing the defendant to refrain from abusing, harassing, or interfering with the person or employment or going near the residence or place of employment of the petitioner, the minor

---

[7] We have also italicized the language added to La. R.S. 46:2135(A) and La. R.S. 46:2136(A) pursuant to this act.

children, or any person alleged to be incompetent, on whose behalf a petition was filed under this Part.

La. R.S. 46:2136 provides, in relevant part:

A. The court may grant any protective order or approve any consent agreement to bring about a cessation of *domestic* abuse *as defined in R.S. 46:2132, or the threat or danger thereof, to* a party, any minor children, or any person alleged to be incompetent, which relief may include but is not limited to:

(1) Granting the relief enumerated in R.S. 46:2135.
. . .
B. A protective order may be rendered pursuant to this Part if the court has jurisdiction over the parties and subject matter and either of the following occurs:

(1) The parties enter into a consent agreement.

(2) Reasonable notice and opportunity to be heard is given to the person against whom the order is sought sufficient to protect that person's right to due process.
. . .
F. (1) Except as provided in Paragraph (2) of this Subsection, any final protective order or approved consent agreement shall be for a fixed period of time, not to exceed eighteen months, and may be extended by the court, after a contradictory hearing, in its discretion. Such protective order or extension thereof shall be subject to a devolutive appeal only.

(2)(a) For any protective order granted by the court which directs the defendant to refrain from abusing, harassing, or interfering with the person as provided in R.S. 46:2135(A)(1), the court may grant the order to be effective for an indefinite period of time as provided by the provisions of this Paragraph on its own motion or by motion of the petitioner. The indefinite period shall be limited to the portion of the protective order which directs the defendant to refrain from abusing, harassing, or interfering with the person as provided in R.S. 46:2135(A)(1).

Stalking and cyberstalking fall under the category of "any offense against the person, physical or non-physical, as defined in the Criminal Code of Louisiana," which is included in the domestic abuse definition set forth in La. R.S. 46:2132(3). *See Shaw v. Young*, 2015-0974 (La. App. 4 Cir. 8/17/16), 199 So. 3d 1180. The receipt or review of a threatening or

harassing electronic communication by a friend of the victim may be

deemed to be cyberstalking. *Shaw v. Young*, *supra*.

The elements of the offense of stalking are set forth in La. R.S.

14:40.2, which states, in pertinent part:

> A. Stalking is the intentional and repeated following or harassing of another person that would cause a reasonable person to feel alarmed or to suffer emotional distress. Stalking shall include but not be limited to the intentional and repeated uninvited presence of the perpetrator at another person's home, workplace, school, or any place which would cause a reasonable person to be alarmed, or to suffer emotional distress as a result of verbal, written, or behaviorally implied threats of death, bodily injury, sexual assault, kidnapping, or any other statutory criminal act to himself or any member of his family or any person with whom he is acquainted.
> . . .
>
> C. For the purposes of this Section, the following words shall have the following meanings:
>
> (1) "Harassing" means the repeated pattern of verbal communications or nonverbal behavior without invitation which includes but is not limited to making telephone calls, transmitting electronic mail, sending messages via a third party, or sending letters or pictures.

The offense of cyberstalking is addressed in La. R.S. 14:40.3, which

states, in relevant part:

> B. Cyberstalking is action of any person to accomplish any of the following:
>
> (1) Use in electronic mail or electronic communication of any words or language threatening to inflict bodily harm to any person or to such person's child, sibling, spouse, or dependent, or physical injury to the property of any person, or for the purpose of extorting money or other things of value from any person.
>
> (2) Electronically mail or electronically communicate to another repeatedly, whether or not conversation ensues, for the purpose of threatening, terrifying, or harassing any person.
>
> (3) Electronically mail or electronically communicate to another and to knowingly make any false statement concerning death, injury, illness, disfigurement, indecent conduct, or

11

criminal conduct of the person electronically mailed or of any member of the person's family or household with the intent to threaten, terrify, or harass.

(4) Knowingly permit an electronic communication device under the person's control to be used for the taking of an action in Paragraph (1), (2), or (3) of this Subsection.
. . .

D. Any offense under this Section committed by the use of electronic mail or electronic communication may be deemed to have been committed where the electronic mail or electronic communication was originally sent, originally received, or originally viewed by any person.

Abuse protection protective orders are reviewed for abuse of discretion. *Shipp v. Callahan*, 47,928 (La. App. 2 Cir. 4/10/13), 113 So. 3d 454. In the area of domestic relations, much discretion is vested in the trial judge, particularly in evaluating the weight of evidence which is to be resolved primarily on the basis of credibility of witnesses. When findings of fact are based upon a decision regarding credibility of witnesses, respect should be given to those conclusions, for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on understanding and believing what is said. *Rosell v. ESCO*, 549 So. 2d 840 (La. 1989); *Gerhardt v. Gerhardt*, 46,463 (La. App. 2 Cir. 5/18/11), 70 So. 3d 863.

### *Discussion*

Kelly argues that the trial court erred in granting the protective order because Elizabeth did not show any current physical or sexual abuse or an offense against the person. We disagree. Under La. R.S. 46:2136(A), the trial court is permitted to grant a protective order "to bring about a cessation of domestic abuse as defined in R.S. 46:2132, or the threat or danger thereof." We find that the evidence submitted by Elizabeth and accepted by

12

the trial court as credible established recent actions by Kelly which constituted offenses against the person as included in the "domestic abuse" definition.

Kelly contends that cyberstalking is not a crime against the person. However, recent jurisprudence has established persuasively that it is. *See Shaw v. Young*, *supra*. This is particularly true in light of the 2015 amendment to La. R.S. 46:2132(3). Elizabeth's unrefuted testimony demonstrated that Kelly repeatedly utilized electronic means of mail and/or communication to harass her. Elizabeth also testified without contradiction about Kelly's repeated uninvited presence at her home, as well as the alarm and emotional distress these actions have caused. This harassment in the form of stalking further supports the trial court's decision to issue the protective order.

Based upon our review of the record, we find the trial court did not abuse its discretion in granting the protective order in favor of Elizabeth and the children. The record amply shows that the recent actions of Kelly, who has a history of physically abusing and harassing his former wife, involved "offenses against the person," i.e., stalking and cyberstalking.

## RELEVANCE AND HEARSAY OBJECTIONS

Kelly contends that the trial court erred in allowing admission of hearsay testimony about statements made by his current wife, Jennifer.[8] He argues that none of his current wife's statements from the two police-related incidents at his home in July 2018 should have been admitted because they

---

[8] While Kelly also states in his brief that the trial court erred in "refusing to honor the spousal privilege," he does not make any argument on this issue. Consequently, we will not address it.

13

were irrelevant and immaterial. He even claims that none of the police officers' testimony about the police visits to his home should have been admitted because these events did not concern Elizabeth. We disagree.

### *Law*

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. C.E. art. 401. All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of Louisiana, this Code of Evidence, or other legislation. Evidence which is not relevant is not admissible. La. C.E. art. 402.

"Hearsay" is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801(C). Hearsay is not admissible except as otherwise provided by this Code or other legislation. La. C.E. art. 802.

### *Discussion*

These police visits to Kelly's home occurred in close proximity of time and distance to an incident when Kelly went to Elizabeth's house late at night, beat on the door, demanded to see the children, and made a gun shooting motion which was captured on the cameras of her security system.[9]

---

[9] In light of Elizabeth's testimony that, shortly before their separation, Kelly held a loaded gun to her head in the children's presence and threatened to kill her, this action is of profound significance.

Kelly argues in brief that an adverse inference as to the existence of such a recording should be drawn because Elizabeth did not admit the video of this action into evidence when she testified about the incident. He also asserts that Elizabeth's account of this incident is "unbelievable." However, the trial court specifically found that all the

The first police visit to Kelly's house occurred later that same night. The second one happened the following night and resulted in Kelly's involuntary commitment to a hospital after a bizarre episode in which he admitted burning his wife's purse in the kitchen. These events support Elizabeth's narrative pertaining to Kelly's escalating and extremely disturbing behavior and are probative of Kelly's mental health at that time. As such, they were highly relevant to the protective order proceedings.

The record reveals that the trial court used considerable restraint in admitting testimony pertaining to statements by Jennifer during these events. During Corporal Person's testimony, Kelly's counsel objected to him repeating what Jennifer said about her husband on July 16, 2018, when the officer arrived at the house she shared with Kelly in response to a welfare concern call. The trial court admitted the testimony "for the purpose of showing that a call was made, and he responded. Past that, it's hearsay unless she is here." Kelly's counsel objected to a question about the nature of the welfare call; he admitted that anything Kelly said would fall under a hearsay exception but maintained that Jennifer's statements would not. The trial court sustained the objection. The trial court then sustained a hearsay objection made by Kelly's counsel when the officer testified about statements made to him by Jennifer about a conversation she had with her husband. (The trial court declined to entertain an objection based on spousal privilege because neither spouse was present to assert it.)

witnesses testified credibly and truthfully in all matters, which included Elizabeth's uncontradicted testimony about this event.

Interestingly, the testimony of one of the police officers suggests that he might have seen the video at some point in time. When asked if he saw a video on the night of the incident, Sergeant Sutis replied, "No, it was not that night that I saw a video." He later stated, "And like I said, I don't believe we viewed the video that night."

Sergeant Sutis was allowed to testify that Jennifer was the complainant on the July 15, 2018 call at Kelly's residence. The trial court then sustained a hearsay objection by Kelly's counsel when the officer was asked if Jennifer made any statements to him. It did not accept Elizabeth's argument that Jennifer's statements would fall within the present sense impression or excited utterance exceptions to the hearsay rule under La. C.E. 803(1) and (2). As to Sergeant Sutis' visit to Kelly's house the next night, Kelly's counsel did not object to the officer's testimony about his conversation with Jennifer until he began to recite what she told him "during the course of the investigation." When Kelly's counsel objected, the trial court sustained the objection.

Based upon our review of the record, we find that the trial court properly allowed testimony about the highly relevant police events involving Kelly and his current wife, which occurred in close proximity to a disturbing incident at Elizabeth's home. Furthermore, given the fact that the trial court sustained almost all hearsay objections made by Kelly's counsel, we find no error in the trial court's ruling on the officers' testimony as to Jennifer's statements to them.

## EXPANSION OF PLEADINGS

Kelly argues that the trial court erred in allowing the pleadings to be expanded outside the ambit of Elizabeth's original petition, which did not plead any current physical or sexual abuse. He claims that it constituted a "surprise attack" against which he could not defend.

The original petition asserted a recent escalation of frightening actions by Kelly. They included harassment; uninvited presence at the home, workplace, school and other places of the "protected person(s)"; and both

stalking and cyberstalking, Kelly having been arrested for the latter. Furthermore, Elizabeth clearly stated that she feared for her life due to Kelly's conduct. Although some evidence of Kelly's history of violence and harassment was properly presented as background, we find that the evidence at the hearing generally comported with the allegations of the original petition. The police visits which led to Kelly's commitment about a month prior to the petition's filing were relevant to Elizabeth's assertion of "increasingly erratic behavior" by Kelly.

Furthermore, we note that, at the beginning of the hearing, Kelly's counsel agreed to proceed under the Domestic Abuse Assistance Act without objection. We find that, by doing so, Kelly waived his right to complain about any expansion of the original petition, which was filed under the provisions pertaining to stranger and acquaintance stalking.

## COSTS

Kelly contends that the trial court erred in assessing costs against him because the protective order was wrongfully entered. As we are upholding the issuance of the protective order, we find no merit to this argument.

## CONCLUSION

We affirm the trial court's granting of the protective order in favor of Elizabeth Larremore and the children and against Kelly Larremore. Costs in this court are assessed against Kelly Larremore.

**AFFIRMED.**