LEAH ANGELIQUE ALEXANDER

VERSUS

THADDEUS R. VICTOR

NO. 23-CA-173

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-NINTH JUDICIAL DISTRICT COURT
PARISH OF ST. CHARLES, STATE OF LOUISIANA
NO. 91,425, DIVISION "D"
HONORABLE M. LAUREN LEMMON, JUDGE PRESIDING

October 31, 2023

**JOHN J. MOLAISON, JR.**
**JUDGE**

Panel composed of Judges Fredericka Homberg Wicker,
John J. Molaison, Jr., and Scott U. Schlegel

**AFFIRMED; REMANDED**
    **JJM**
    **SUS**

**DISSENTS WITH REASONS**
    **FHW**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Morgan Naquin
Deputy, Clerk of Court

COUNSEL FOR DEFENDANT/APPELLANT,
THADDEUS R. VICTOR
    Orrin A. Marino

**MOLAISON, J.**

In this matter pertaining to the issuance of a domestic abuse protection order, the appellant challenges the sufficiency of evidence presented at trial by the appellee. The appellant also contends that the trial court erred in listing his minor child as one of the persons protected under the order. For the reasons that follow, we affirm the judgment in part, and remand for clarification.

## PROCEDURAL HISTORY

A verified petition for protection from abuse was filed by Leah Alexander pursuant to La. R.S. 46:2131, *et. seq* on November 21, 2022, at the Twenty-Ninth Judicial District Court for the Parish of St. Charles, listing herself and her minor child, R.V.[1] as protected persons from the appellant, Thaddeus Victor. Mr. Victor was identified as R.V.'s father and Ms. Alexander's former fiancée. On that same date, the trial court issued a temporary restraining order which found that the allegations presented an immediate and present danger to the physical safety of the protected persons, and that the allegations presented also constituted stalking and sexual assault. The temporary restraining order, which remained in effect until the hearing date of December 12, 2022, provided that Mr. Victor could not go within 100 yards of Ms. Alexander and R.V., and he was also ordered not to interfere with the physical custody of R.V. On December 12, 2022, a hearing on Ms. Alexander's petition was held. The trial court granted relief on that date and extended the protective order through June 12, 2024.[2] This timely appeal follows.

## ASSIGNMENT OF ERROR ONE

The evidence presented during the protective order hearing was insufficient

---

[1]This opinion will use the initials of the minor child, rather than the full name, to protect and maintain the privacy of the minor child involved in this proceeding. *Burds v. Skidmore*, 19-0263 (La. App. 4 Cir. 3/22/19), 267 So.3d 192, 193; *D.M.S. v. I.D.S.*, 14-0364 (La. App. 4 Cir. 3/4/15), 225 So.3d 1127, 1130.

[2] The original order provided an expiration date of June 12, 2023. On December 13, 2022, an amended order was issued to provide the correct date of the expiration as June 12, 2024.

to establish by preponderance of the evidence that a protective order should have been granted by the court. Ms. Alexander failed to prove the that allegations meet the legal definition of domestic abuse by a preponderance of the evidence.

## LAW AND ANALYSIS

### *The petition*

The petition for protection from abuse filed by Ms. Alexander on November 21, 2022, alleged various acts against her by Mr. Victor over the previous year, which included being punched, choked, shoved, stalked, threatened and sexually abused. Ms. Alexander also alleged that Mr. Victor had abused her while she was pregnant, had abused their minor child, and threatened or attempted suicide. The petition stated that the most recent incident occurred on November 20, 2022. Ms. Alexander indicated that, on that date, she went to pick up R.V. from the defendant, when he engaged her in a verbal altercation as she was securing R.V. in her the vehicle. Mr. Victor then grabbed her by the neck and punched her in the side. As the defendant pulled R.V. from the vehicle, the child struck his head. She thereafter contacted police. The petition stated that the first incident of violence occurred when Mr. Victor learned that Ms. Alexander was pregnant. She also indicated that she was fearful for her own and R.V.'s safety.

### *The December 12, 2022 hearing*

Ms. Alexander testified at the December 12, 2022 hearing and provided an overview of her relationship with Mr. Victor, which had reportedly become volatile in recent years. Generally, Mr. Victor was constantly suspicious that Ms. Alexander was engaged in affairs, which she denied. Also, Mr. Victor had been caught having affairs on multiple occasions. Ms. Alexander stated that Mr. Victor had started becoming abusive toward her after she became pregnant. She recounted that on January 1, 2021, the couple was staying at the Westin Hotel in New Orleans. That day, Mr. Victor began questioning her about a man who followed

her on social media. When Ms. Alexander tried to leave the room, Mr. Victor threw her on the bed and choked her. She gave him back the engagement ring at that time. After the incident, the couple reconciled and, in May of 2021, they moved in with her parents.

Ms. Alexander described a second incident of abuse that occurred on August 15, 2022. On that date, she confronted Mr. Victor with suspicions that he was cheating on her. At the time, he said he wanted to borrow her car and leave to go visit a friend. Ms. Alexander testified that Mr. Victor grabbed her cell phone while she was holding R.V., and she tried to get the phone back while standing next to their bed. Mr. Victor allegedly grabbed R.V. from her hands, shoved her to the bed and began choking her.

Ms. Alexander moved in with Mr. Victor's parents on November 20, 2021. On February 15, 2022, the defendant accused her of infidelity. When she tried to leave, he physically stopped her from exiting the house, took her cell phone, and blocked her from the doors. Ultimately, after she got out of the house, Mr. Victor jumped onto her car from prevent her from leaving the driveway. She called her parents during the incident to help her get away from Mr. Victor.

Ms. Alexander recounted that Mr. Victor stalked her repeatedly, even showing up at her work. On one occasion, he tried to fraudulently obtain her cell phone, which she had left at a repair store. Mr. Victor constantly texted her to see where she was, and also went to her mother's house in the middle of the night with R.V. in the car to see if she was there.

On November 20, 2022, Ms. Alexander went to pick up R.V. at the home of Mr. Victor's parents. At that time, he came outside of the house without R.V. and said that he wanted to talk to her. Ms. Alexander testified that she refused and said she wanted to get R.V. When she tried to go inside, Mr. Victor pushed her back repeatedly. Mr. Victor's mother was watching from the porch while holding the

R.V. and appeared to be confused. Ultimately, Mr. Victor agreed to put R.V. in the car seat, and his mother asked Ms. Alexander not to call the police. As Ms. Alexander tried to buckle R.V. into his car seat, Mr. Victor pushed her to the side, grabbed R.V. went back toward the house. Ms. Alexander alleged that R.V. hit his head in the process. Ultimately, both Ms. Alexander and Mr. Victor called the police. After the police arrived and interviewed both parties, they allowed Mr. Victor to maintain custody of R.V. at that time, and Ms. Alexander left.

On cross examination, Ms. Alexander clarified that she never reported the incidents of August and November 2022 to police, and police never questioned her about those events. She also never alerted hotel security about the incident at the Westin hotel. Ms. Alexander also indicated that there is no formal custody agreement between her and Mr. Victor. She explained that her allegations of child abuse against Mr. Victor stemmed from R.V. hitting his head Mr. Victor pulled him from the car and also for not having R.V. appropriately dressed for the cold weather that evening. After the incident in August of 2022, she told Mr. Victor's mother, who asked her not to call police.

Erica Tate, Ms. Alexander's mother, was called as a witness. She described that the transfer of R.V. back and forth between the parties was problematic, and she suggested to Ms. Alexander that she bring one of her sisters along as a witness. Mrs. Tate also suggested that the parties meet at a neutral location. Mrs. Tate indicated that she never saw any violence between Ms. Alexander and Mr. Victor when they lived at her home, but she did witness them argue in the driveway once. She was aware of physical incidents between Ms. Alexander and Mr. Victor that occurred at the home of Mr. Victor's parents.

Mr. Victor testified at the hearing. On direct examination, he denied that he had ever committed any acts of physical violence against Ms. Alexander, although he alleged that she had acted violently toward him on occasion. He also denied

threatening or stalking Ms. Alexander, or threatening to kill himself. In connection with his testimony about the November 20, 2022 incident, he introduced video evidence taken from an alarm system camera that showed the driveway of his parents' home. He denied hitting Ms. Alexander or causing R.V. to hit his head at that time.

Mr. Victor admitted showing Ms. Alexander a video that depicted a man killing his children and himself, but denied telling her that he related to the video's contents.   He admitted that he had driven Ms. Alexander on one occasion to a home she had secretly been looking into buying, but he said that going to the particular house was just a coincidence and that he had not been tracking her movements. Mr. Victor denied that he had tried to obtain Ms. Alexander's phone from a repair shop, and contended that he was there merely to pay for the phone's repair.  While admitting that he believed Ms. Alexander had been unfaithful to him during the relationship, he denied tracking her phone or accusing her of giving him a sexually transmitted disease.

Mr. Victor's mother, Reanda, also testified. She said that she had never witnessed physical violence between her son and Ms. Alexander, although she had heard Ms. Alexander threaten her son with violence.  She admitted that Ms. Alexander told her that Mr. Victor had tried to strangle her. Mrs. Victor denied seeing any physical contact between her son and Ms. Alexander on November 20, 2022, and did not see R.V. hit his head on that date. Mrs. Victor claimed that her son was simply asserting his parental rights. Mrs. Victor described an incident that occurred in September of 2020 at her home, when she heard the couple arguing and went outside and saw Ms. Alexander holding a hammer in her hand. She did not see Ms. Alexander strike her son with the hammer.

In rebuttal, Ms. Alexander claimed that she retrieved the hammer from her car in self-defense after Mr. Victor dragged her on the ground by her hair. She did not report the September 2020 incident to police.

At the conclusion of the hearing, the Court verbally granted the protective order as to Ms. Alexander only, and facilitated a shared custody schedule between the parties by consent.

***The Domestic Abuse Assistance Law***

La. R.S. 46:2135 provides, in part:

> A. Upon good cause shown in an ex parte proceeding, the court may enter a temporary restraining order, without bond, as it deems necessary to protect from abuse the petitioner, any minor children, or any person alleged to be an incompetent. Any person who shows immediate and present danger of abuse shall constitute good cause for purposes of this Subsection. The court shall consider any and all past history of abuse, or threats thereof, in determining the existence of an immediate and present danger of abuse. There is no requirement that the abuse itself be recent, immediate, or present. The order may include but is not limited to the following:

> (1) Directing the defendant to refrain from abusing, harassing, or interfering with the person or employment or going near the residence or place of employment of the petitioner, the minor children, or any person alleged to be incompetent, on whose behalf a petition was filed under this Part.

Domestic abuse is not limited to physical or sexual abuse, but includes any offense against the person, physical or non-physical, as defined in the Louisiana Criminal Code, except negligent injury and defamation, committed by one family member, household member, or dating partner, against another. La. R.S. 46:2132(A)(3).

Under the Domestic Abuse Assistance law, the trial court may grant a protective order directing the defendant from "abusing, harassing, or interfering with" the petitioning party. La. R.S. 46:2135(A)(1); La. R.S. 46:2136(A)(1). To obtain a protective order under this law, the petitioner must prove the allegations of abuse by a preponderance of the evidence. La. R.S. 46:2135(B). Proof by preponderance of the evidence is when the entirety of the evidence shows that the

fact sought to be proved is more probable than not. *Shaw v. Young*, 15-974 (La. App. 4 Cir. 8/17/16); 199 So.3d 1180, 1183. In cases decided pursuant to the Domestic Abuse Assistance statute, a trial court's order is reversible only upon a showing of an abuse of discretion. *Ruiz v. Ruiz*, 05-175 (La. App. 5 Cir. 7/26/05), 910 So.2d 443, 445, *citing Rouyea v. Rouyea*, 00-2613 (La. App. 1 Cir. 3/28/01), 808 So.2d 558, 561.

In this assignment of error, Mr. Victor essentially challenges the credibility of Ms. Alexander as a witness, claiming that her testimony was inconsistent, contradictory and untruthful. The trial court sitting as the trier of fact is in the best position to evaluate the demeanor of the witnesses and its credibility determinations will not be disturbed by this Court absent manifest error. *Ruiz, supra*. To reverse a fact-finder's determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and that the record establishes that the finding is clearly wrong. *Rabalais v. Nash*, 06–999 (La. 3/9/07); 952 So.2d 653, 657. Where the fact-finder's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even if convinced that it would have weighed the evidence differently and reached a different result. *Id.*

In order to reverse a protective order, the appellate court must review the record in its entirety and conclude that a reasonable factual basis does not exist for the finding and the factfinder is clearly wrong or manifestly erroneous. *State in the Interest of C.D.*, 18-834 (La. App. 4 Cir. 12/19/18), 262 So.3d 929, *writ denied*, 19-120 (La. 3/6/19), 266 So.3d 903. At the hearing in this matter, the trial court indicated that it was granting the protective order based on the testimony presented. After a review of the record, we find that the trial court's credibility determinations with respect to both parties are reasonably supported. Accordingly, we see no clear error in the trial court's ruling that Ms. Alexander demonstrated

she was the victim of domestic abuse, which resulted in the granting of the protective order at issue.

## ASSIGNMENT OF ERROR TWO

The trial court abused its discretion by including the minor child, R.V. as a protected person in the Protective Order that was granted after hearing.

## ANALYSIS

In this assignment, Mr. Victor contends that the evidence presented during the protective order hearing was insufficient to establish by preponderance of the evidence that a protective order in favor of R.V. should have been granted by the court. As discussed above, R.V. was named as a protected person in the petition filed on November 21, 2022. In addition, there was testimony at trial regarding Ms. Alexander's allegation that Mr. Victor had injured R.V. while removing him from Ms. Alexander's car. There was no other evidence of an injury to R.V. produced at the December 12, 2022 hearing.

Mr. Victor is correct that the trial judge specifically indicated at the conclusion of the hearing that the protective order only applied to Ms. Alexander.[3] However, the order itself indicates that a "child" is among the protected persons, even though no finding of abuse was made under the Louisiana Children's Code. In addition, the trial court implemented weekend visitation for Mr. Victor with R.V., which would be appear to be inconsistent with the terms of the November 12, 2022 protective order, which expired. When all of these factors are taken together, it would appear that R.V.'s inclusion in the December protective order was in error. Accordingly, out of an abundance of caution, we remand the judgment to the trial court to clarify who the protected persons in its order are.

---

[3] We note that the trial court made no reference to the protection of R.V. from abuse in its Reasons For Judgment.

**DECREE**

For the foregoing reasons, the judgment of the trial court is affirmed in part, and the judgment is remanded for clarification.

**AFFIRMED; REMANDED**

LEAH ANGELIQUE ALEXANDER

VERSUS

THADDEUS R VICTOR

NO. 23-CA-173

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

**WICKER, J., DISSENTS WITH REASONS**

I have considered the position of the majority, and I respectfully disagree. A petitioner seeking a protective order has the burden of proving allegations of abuse by a preponderance of the evidence. La. R.S. 46:2135(B). In my view, the testimony and evidence presented at trial was insufficient to establish by a preponderance of the evidence that Ms. Alexander was entitled to a protective order against Mr. Victor.

The Domestic Abuse Assistance Act, La. R.S. 46:2131, *et seq.*, provides protection in the form of temporary restraining orders and protective orders for persons subject to domestic abuse. *S.M. v. T.M.*, 19-369 (La. App. 5 Cir. 12/26/19), 289 So.3d 141, 143; *Lepine v. Lepine*, 17-45 (La. App. 5 Cir. 6/15/17), 223 So.3d 666, 674. Domestic abuse "includes but is not limited to physical or sexual abuse and any offense against the person, physical or non-physical, as defined in the Criminal Code of Louisiana, except negligent injury and defamation, committed by one family member, household member, or dating partner against another." La. R.S. 46:2132(3). The courts of this state have determined that the definition of domestic abuse does not include nonphysical acts, such as general harassment or family arguments, if those acts do not rise to the level of physical abuse, or otherwise constitute an offense against the person as defined in the Louisiana Criminal Code. *S.M.*, 289 So.3d at 144; *Ariatti v. Plaisance*, 18-84 (La. App. 5 Cir. 9/13/18), 255 So.3d 1239, 1248.

The purpose of the Domestic Abuse Assistance Act is to provide relief to victims of domestic violence by establishing a civil remedy which affords immediate and easily accessible protection. *Aguillard v. Aguillard*, 19-757 (La. App. 3 Cir. 7/8/20), 304 So.3d 473, 486; *D.M.S. v. I.D.S.*, 14-364 (La. App 4 Cir. 3/4/15), 225 So.3d 1127, 1137, *writ denied*, 15-897 (La. 6/19/15), 172 So.3d 654. While I fully support the purpose of the Domestic Abuse Assistance Act, it is important to understand that having a protective order issued against a person is a serious matter and such order should not be granted unless the petitioner meets her burden of proof.

In accordance with La. R.S. 46:2135 and 46:2136, the petitioner must show "good cause" for the issuance of protective order.[4] Pursuant to La. R.S. 46:2135, "good cause shown" is an immediate and present danger of abuse against the petitioner. *Carrie* v. *Jones*, 21-0659 (La. App. 4 Cir. 1/21/22), 334 So. 3d 834, 842.

In the present case, I do not believe that Ms. Alexander established that there was an immediate and present danger of abuse. The only evidence supporting Ms. Alexander's allegations of abuse was her own testimony. While the testimony of one witness can be sufficient in domestic abuse cases, Ms. Alexander's testimony was full of inconsistencies and contradicted by other evidence. Under these circumstances, a protective order should not have been issued.

In her petition for protection from abuse filed on November 21, 2022, Ms. Alexander alleged that the most recent incident of abuse, which caused her to file the petition, occurred on November 20, 2022. She claimed that she went to pick

---

[4] The jurisprudence provides that the good cause requirement applicable to temporary restraining orders also applies to actions seeking protective orders. *S.L.B. v. C.E.B.*, 17-978, 17-979, 17-980 (La. App. 4 Cir. 7/27/18), 252 So.3d 950, 956, *writ denied*, 18-1442 (La. 11/20/18), 256 So.3d 992.

up their 17-month-old son, R.V., from Mr. Victor's house, but he refused to allow her to take him and a verbal altercation ensued. In her petition, Ms. Alexander alleged:

> As petitioner was securing the child into her vehicle, defendant grabbed her by the neck, punched her in the side, and grabbed the child from the vehicle. The child struck his head on the vehicle as defendant pulled him from the vehicle and ran into the residence while pushing petitioner away.

At trial, Ms. Alexander testified that when she went to pick up R.V. from Mr. Victor on November 20, 2022, they got into an argument and he would not allow her to take R.V. She stated that Mr. Victor's mother was holding R.V. outside, but Mr. Victor kept pushing her back and blocking her so that she could not get to him. According to Ms. Alexander, at some point, Mr. Victor agreed to put R.V. in the car. However, when she went to strap him in and buckle his seatbelt, Mr. Victor grabbed her from the back of the neck, and punched and shoved her to the side. He then took R.V. out of the car seat and ran towards the house. Ms. Alexander testified that she followed behind, but R.V. was "being flung every which way" and she could not get him, so she called the police.

Mr. Victor testified that when he was bringing R.V. to her car, Ms. Alexander was hurling threats and clapping her hands aggressively. He did not think Ms. Alexander was in "the right state of mind," so he went back into the house with R.V. According to Mr. Victor, Ms. Alexander followed them into the house and started punching him and putting her hand on his neck in order to get to R.V. A short time later, Mr. Victor agreed to bring R.V. back to her car. He testified that after he put R.V. in the car and strapped him in, Ms. Alexander told him that he would never see his son again, so he took the child out of the car and went back inside the house. Mr. Victor testified that he did not grab Ms. Alexander by the neck or punch her.

The security system video from the driveway of Mr. Victor's house does not show that Mr. Victor physically abused or harmed Ms. Alexander on November 20, 2022.[5] Rather, it shows that Mr. Victor was carrying R.V. and walked down the driveway, along with his mother and Ms. Alexander. There was a discussion taking place, and when Ms. Alexander opened the car door, Mr. Victor turned around and walked back toward the house with R.V. A short time later, the video shows that Ms. Alexander marched down the driveway toward the car, with Mr. Victor, his mother, and R.V. following. Both parties appeared to be upset, with Ms. Alexander flailing her arms, and pointing her finger at Mr. Victor. Mr. Victor put R.V. in the car, and he and his mother turned around and started back up the driveway.[6] The parties appear to have continued arguing and Mr. Victor returned to the car, took R.V. out, and started walking back toward the house. Mr. Victor and his mother both testified that Mr. Victor became upset, because Ms. Alexander told him he would not see R.V. Ms. Alexander initially followed but then returned to her car and appeared to make a phone call.

In addition, according to the police reportto the police report from November 20, 2022, Ms. Alexander reported that she went to pick up R.V. from Mr. Victor, and they began arguing. She informed the police that Mr. Victor grabbed her and pushed her away from R.V. The report does not indicate she informed the police that Mr. Victor grabbed her by the neck and punched her in the side, as alleged in the petition for protection from abuse. The police report indicates that the responding officer "did not observe any signs of any physical violence." The officer allowed R.V. to remain with Mr. Victor and advised the parties to seek civil counsel regarding custody.

---

[5] Although Ms. Alexander's car was at the top of the video screen and it is difficult to closely see every movement when Mr. Victor took R.V. out of the car, the video does not suggest that Mr. Victor punched Ms. Alexander or that his actions rose to the level of physical abuse.

[6] Mr. Victor's mother appeared to be pulling him away from Ms. Alexander's car. She testified that she did this because Ms. Alexander would call the police when she got angry and she "just wanted peace."

The police report also indicates that Ms. Alexander informed the police that there was a pending custody case and that she had primary custody of R.V. However, no custody proceeding was pending and no formal custody arrangement was in place at that time. Ms. Alexander denied that she made these assertions to the police.

In her petition, Ms. Alexander included R.V. as a "protected person," claiming he was abused by Mr. Victor. At trial, she testified that the abuse allegations pertaining to R.V. consisted of Mr. Victor hitting R.V.'s head when taking him out of the car and improperly dressing him for the cold weather outside on November 20, 2022. She also alleged that R.V. was crying and reaching his arms out to Ms. Alexander, and was "being flung every which way." Mr. Victor, on the other hand, testified that R.V. did not hit his head or cry, and he did not have any bruises or marks on him.

The video reflects that R.V. was wearing a jacket and that Mr. Victor pulled the hood over R.V.'s head at some point. It does not show he was improperly dressed for cold weather. Further, in the video, R.V. does not appear to be in any distress, crying, or reaching for his mother. It is unclear on the video as to whether R.V. hit his head when being taken out of his car seat, but there is nothing to suggest Mr. Victor abused his son.

Considering the testimony of both parties, along with the video and police reports, I do not believe that Ms. Alexander proved by a preponderance of the evidence that Mr. Victor abused her or R.V. on November 20, 2022.

When considering whether to grant a protective order for good cause shown, the trial court must consider "any and all past history of abuse, or threats thereof, in determining the existence of an immediate and present danger of abuse." La. R.S. 46:2135(A); *Milam v. Hughes*, 22-407 (La. App. 1 Cir. 12/29/22), 360 So.3d 852, 858. Although Ms. Alexander testified regarding prior incidents of abuse,

allegedly occurring more than a year before the petition was filed, this testimony also contained inconsistencies.

At trial, Ms. Alexander testified that she and Mr. Victor found out she was pregnant in November of 2020 and that "the first incident of actual physical abuse" occurred on January 1, 2021 at the Westin hotel in New Orleans. She stated that they got into an argument and when she tried to leave the hotel room, he pushed her on the bed and choked her. Ms. Alexander testified that she did not report the January 2021 incident to hotel security, because Mr. Victor apologized. She also stated that she did not seek medical attention or report the incident to anyone, including her family. Mr. Victor testified that he remembered staying at the Westin hotel on January 1, 2021, but he did not recall any physical altercation and did not push her on the bed or choke her.

Ms. Alexander testified that the second incident of abuse occurred on August 15, 2021,[7] when they argued and Mr. Victor grabbed R.V. from her hands, pushed her on the bed, and started choking her. She admitted that she did not call the police on this occasion, and there was no testimony or evidence to corroborate her claims. Mr. Victor admitted that they had a verbal altercation on that date, but he denied having a physical altercation.

The record shows that almost a year later, on August 3, 2022, the police responded to Mr. Victor's house in reference to a female being held against her will and not being allowed to leave the residence. When the police arrived, Ms. Alexander was no longer at the scene. According to the police report, Mr. Victor explained that he did not believe Ms. Alexander was in "the right state of mind," so he would not let her leave with their son. According to the police report, Ms. Alexander arrived back at the scene while the police were speaking to Mr. Victor,

---

[7] Ms. Alexander stated that this second incident of abuse occurred on August 15, 2022, right before Hurricane Ida. However, considering Hurricane Ida was in 2021, it appears this is the correct date.

and she reported, consistent with Mr. Victor's report, that Mr. Victor would not allow her to leave with their son. The report does not indicate that Ms. Alexander made any allegations of violence or physical abuse. The officer advised the parties that the issue was a civil matter, noting that no court ordered documentation regarding custody was in place, and Ms. Alexander left. Ms. Alexander testified that she lived with Mr. Victor and his parents after this incident from August 2022 until October 3, 2022.

During Mr. Victor's case, his mother testified about an alleged incident in September 2020. She stated that Ms. Alexander came to their driveway with a hammer due to "some disagreement they had," and Mr. Victor was able to take the hammer away from her. Thereafter, when Ms. Alexander presented her rebuttal testimony, she addressed the September 2020 incident and stated that she keeps the hammer in her car for self-defense. She also testified that on that occasion, Mr. Victor grabbed her out of her car, dragged her to the ground, pulled her ponytail out, and wrestled her on the ground.

Defense counsel asked Ms. Alexander why she was now claiming this physical altercation occurred in September 2020, when she had previously testified that the first incident of physical violence occurred in January 2021. Ms. Alexander responded that she had previously testified that the January 2021 incident was first time Mr. Victor choked her, not the first time he was physically violent. However, the record reflects that during presentation of her case, Ms. Alexander stated that the January 2021 incident at the Westin was "the first incident of actual physical abuse" in their relationship. She also stated that prior to that incident, she "did not see or witness any kind of violence or aggressive behavior" from Mr. Victor, and "it had never got to a point where it became violent or aggressive."

Considering the inconsistencies in Ms. Alexander's testimony and the discrepancies between her testimony and both the police report and video, some corroborative evidence of Ms. Alexander's claims would have certainly benefitted her case. However, Ms. Alexander did not present any photographs, or even allegations, that she suffered any injuries, scratches, or bruises as a result of Mr. Victor's alleged abuse. Further, there was no evidence that anyone witnessed Mr. Victor abuse or threaten to abuse Ms. Alexander.

Ms. Alexander's mother testified that the parties lived with her for three or four months before R.V. was born. She witnessed arguments between them, but she did not see anything physical or hear Mr. Victor make any threats. Mr. Victor's mother testified that Ms. Alexander had lived with them on and off since November of 2020. She stated that she witnessed arguments between the parties but never saw Mr. Victor become physically violent. However, she had seen Ms. Alexander "come at" Mr. Victor physically. Mr. Victor's mother also testified that she was present during the entire November 20, 2022 incident, and Mr. Victor did not grab Ms. Alexander by the neck, punch her, or hit R.V.'s head.

Allegations of domestic abuse are always serious and should not be taken lightly. However, I do not believe that Ms. Alexander's allegations, without any support, are sufficient to meet her burden of proving that she is entitled to a protective order. Rather, I think the issues between the parties should be litigated in a domestic proceeding pertaining to custody and visitation.

The parties are the parents of a young child, and there is often animosity between parents when custody exchanges occur. It is clear that Mr. Victor wants to be in his son's life and to spend more time with him. Ms. Alexander testified that after the November 20, 2022 incident, Mr. Victor sent her a text message later that night saying that it was not okay to keep their son away from either parent. While a protective order is a valuable tool to prevent domestic abuse, I do not

believe it should be used as a tool to obtain leverage in child custody proceedings or to retaliate against each other without sufficient proof.

In *Culp v. Culp*, 42,239 (La. App. 2 Cir. 6/20/07), 960 So. 2d 1279, 1283, *writ not considered*, 07-1836 (La. 10/5/07), 964 So. 2d 378, the Second Circuit stated:

> We are mindful that the courts could quickly be overwhelmed if every unpleasant child custody exchange or contentious relationship between former spouses warranted a TRO or protective order….La. R.S. 46:2131 emphasizes that the purpose of the statute is to equalize the treatment of crimes between family members and those between strangers. It further emphasizes the need to protect victims from violent behavior. Those purposes reflect that the [Domestic Abuse Assistance Law] has a limited reach.

Based on the record before us, I do not believe Ms. Alexander presented sufficient evidence to prove her allegations of abuse, or that she was in immediate danger of abuse, by a preponderance of the evidence. Accordingly, I believe the trial court abused its discretion by issuing a protective order against Mr. Victor. For these reasons, I would reverse and vacate the protective order issued in this matter, not only as to R.V. but also as to Ms. Alexander.

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**OCTOBER 31, 2023** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES
NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

**23-CA-173**

### E-NOTIFIED
29TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE M. LAUREN LEMMON (DISTRICT JUDGE)
ORRIN A. MARINO (APPELLANT)

### MAILED
LEAH ANGELIQUE ALEXANDER
(APPELLEE)
105 NANA GIN COURT
MONTZ, LA 70068