CYNTHIA BADINGER      *      NO. 2023-CA-0742

VERSUS      *

DAVID ZEKE FALCON      *      COURT OF APPEAL

     FOURTH CIRCUIT

     * 

     STATE OF LOUISIANA

     * * * * * * *

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2023-07439, DIVISION "G"
Honorable Veronica E. Henry
* * * * * *
**Chief Judge Terri F. Love**
* * * * * *

(Court composed of Chief Judge Terri F. Love, Judge Roland L. Belsome, Judge Dale N. Atkins)

Darleen M. Jacobs
Al A. Sarrat
Rene' D. Lovelace
JACOBS SARRAT LOVELACE HARRIS & MATTHEWS
823 St. Louis Street
New Orleans, LA 70112

     COUNSEL FOR PLAINTIFF/APPELLANT, CYNTHIA BADINGER

Shermin S. Khan
THE KHAN LAW FIRM
2714 Canal Street, Suite 300
New Orleans, LA 70119

     COUNSEL FOR DEFENDANT/APPELLEE, DAVID ZEKE FALCON

           **REVERSED; RENDERED; AND REMANDED**
                       **MAY 2, 2024**

*TFL*

*RLB*

*DNA*

This appeal stems from a Petition for Protection from Stalking or Sexual Assault. Cynthia Badinger ("Ms. Badinger") asserted that she was harassed by David Zeke Falcon ("Mr. Falcon"). After a hearing, the trial court found that Ms. Badinger failed to prove stalking by a preponderance of the evidence and dismissed her claims with prejudice.

On review, we find the trial court committed legal error by finding the incidents described by Ms. Badinger did not meet the statutory definition of stalking. Because of this error, we were required to perform a *de novo* review of the record. Based on the evidence presented, we find Ms. Badinger proved by a preponderance of the evidence that she was entitled to protection from Mr. Falcon for stalking. Therefore, we reverse the judgment of the trial court and render judgment in favor of Ms. Badinger. The matter is remanded for the limited purpose of issuing the protective order in accordance with this opinion.

### *FACTUAL BACKGROUND AND PROCEDURAL HISTORY*

Ms. Badinger has resided at 4422 Venus Street in New Orleans her entire life. Mr. Falcon's parents live next door at 4420 Venus Street. Mr. Falcon resides at 4915 Painters Street with his wife and child. On August 1, 2023, Ms. Badinger

filed a Petition for Protection from Stalking or Sexual Assault against Mr. Falcon pursuant to La. R.S. 46:2171, *et seq.*, contending he: 1) harassed a protected person; 2) was an uninvited presence at her home; 3) vandalized and stole property. Specifically, Ms. Badinger alleged two incidents with Mr. Falcon. First, she contends on July 14, 2023, Mr. Falcon removed two landscaping boards from her property and threw them across the street onto a neighbor's trash pile. Secondly, Ms. Badinger avers that on July 28, 2023, Mr. Falcon blocked her driveway and cursed at her when she opened her front door. Ms. Badinger was granted a temporary restraining order through August 21, 2023.

Mr. Falcon moved for an involuntary dismissal at the close of Ms. Badinger's case. The trial court denied the motion. At the completion of the hearing, the trial court found that Ms. Badinger failed to meet the evidentiary standard of proving by a preponderance of the evidence that Mr. Falcon stalked or harassed her. The trial court dismissed Ms. Badinger's claims with prejudice. Ms. Badinger requested written reasons and filed for an appeal.

On appeal, Ms. Badinger asserts the trial court "committed manifest error, abused its discretion, and committed legal error" by dismissing her claims of stalking.

### STANDARD OF REVIEW

Because Ms. Badinger contends the trial court manifestly erred, legally erred, and abused its discretion, a thorough look at our standard of review is warranted.

This Court has previously set forth the standard of review for protection orders:

"An appellate court reviews domestic orders for an abuse of discretion." *Patterson*

2

*v. Charles*, 19-0333, p. 9 (La. App. 4 Cir. 9/11/19), 282 So.3d 1075, 1082 (citation omitted). "The trial court sitting as a trier of fact is in the best position to evaluate the demeanor of the witnesses, and its credibility determinations will not be disturbed on appeal absent manifest error." *Id*[.] (citation omitted). In addition, as to evidentiary issues, "[a] trial court is granted broad discretion in its rulings on evidentiary issues which will not be disturbed on appeal absent a clear abuse of that discretion." *Cipolla v. Cox Commc'ns La., LLC*, 19-0509, p. 2 (La. App. 4 Cir. 8/5/20), 305 So.3d 911, 914 (quoting *Freeman v. Phillips 66 Co.*, 16-0247, p. 4 (La. App. 4 Cir. 12/21/16), 208 So.3d 437, 441). The Court is also "required to examine the record . . . for legal error." *St. Germain v. St. Germain*, 20-0146, p. 9 (La. App. 4 Cir. 3/17/21), 315 So.3d 443, 450 (citing *City of New Orleans v. Badine Land Ltd.*, 07-1066, p. 3 (La. App. 4 Cir. 5/21/08), 985 So.2d 832, 834). "[L]egal errors are reviewed under the *de novo* standard of review." *Id*. (quoting *1026 Conti Condominiums, LLC v. 1025 Bienville, LLC*, 15-0301, p. 5 (La. App. 4 Cir. 12/23/2015), 183 So.3d 724, 727).

"A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial." *Id*. (citation omitted). "Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights." *Id*. (quoting *Evans v. Lungrin*, 97-0541, p. 7 (La. 2/6/98), 708 So.2d 731, 735). "Where an error of law taints the record, we are not bound to affirm the judgment of the lower court." *Id*. (quoting *City of New Orleans*, 07-1066, p. 3, 985 So.2d at 834-35). However, "[a]s long as the trier of fact's findings are reasonable in light of the record as a whole, the appellate court will affirm." *Shaw v. Young*, 15-0974, p. 4 (La. App. 4 Cir. 8/17/16), 199 So.3d 1180, 1184 (citation omitted).

*McKinsey v. Castle*, 2021-0368, pp. 5-6, 2021 WL

3522093, at * 3 (La. App. 4 Cir. 8/10/21). "Thus, in order to reverse a protection order, the appellate court must review the record in its entirety and conclude that a reasonable factual basis does not exit [sic] for the finding and the factfinder is clearly wrong or manifestly erroneous." *Launey v. Launey*, 2020-0072, p. 4 (La. App. 3 Cir. 11/12/20), 307 So.3d 280, 283 (citing *State in the Interest of C.D.*, 18-834(La. App. 4 Cir. 12/19/18), 262 So.3d 929, *writ denied*, 19-120 (La. 3/6/19), 266 So.3d 903).

*Carrie v. Jones*, 21-0659, pp. 3-4 (La. App. 4 Cir. 1/21/22), 334 So. 3d 834, 839-40.

### *STALKING*

The legislature thusly examined the necessity for stalking legislation:

The legislature hereby finds and declares that there is a present and growing need to develop innovative strategies and services which will reduce and treat the trauma of stranger and acquaintance stalking. The nature of stalking allegations are sometimes not easily substantiated to meet the prosecution's burden of proving the case beyond a reasonable doubt, and victims of stalking are left without protection. Orders of protection are a proven deterrent that can protect victims of stalking from further victimization; however, many victims are forced to pursue civil orders of protection through ordinary process, often unrepresented, rather than through a shortened, summary proceeding. Additionally, victims of stalking are not always aware of the vast resources available to assist them in recovering from the trauma associated with being a victim of stalking. It is the intent of the legislature to provide a civil remedy for victims of stalking that will afford the victim immediate and easily accessible protection.

La. R.S. 46:2171.

The Protection from Stalking Act was "enacted to provide a civil remedy for stalking victims against perpetrators, offering immediate and easily accessible protection." *Raymond v. Lasserre*, 22-0793, p. 5 (La. App. 1 Cir. 3/6/23), 368 So. 3d 82, 87 (citing La. R.S. 46:2171), *reh'g denied* (5/25/23), *writ denied*, 23-00893

4

(La. 10/31/23), 372 So. 3d 335. Pursuant to La. R.S. 46:2172, "'stalking' means any act that would constitute the crime of stalking under [La.] R.S. 14:40.2 or cyberstalking under [La.] R.S. 14:40.3." La. R.S. 14:40.2(A) defines stalking as:

> the intentional and repeated following or harassing of another person that would cause a reasonable person to feel alarmed or to suffer emotional distress. Stalking shall include but not be limited to the intentional and repeated uninvited presence of the perpetrator at another person's home, workplace, school, or any place which would cause a reasonable person to be alarmed, or to suffer emotional distress as a result of verbal, written, or behaviorally implied threats of death, bodily injury, sexual assault, kidnapping, or any other statutory criminal act to himself or any member of his family or any person with whom he is acquainted.

"'Harassing' is defined as 'the repeated pattern of verbal communications or nonverbal behavior without invitation which includes but is not limited to making telephone calls, transmitting electronic mail, sending messages via a third party, or sending letters or pictures.'" *Patterson v. Charles*, 19-0333, p. 10 (La. App. 4 Cir. 9/11/19), 282 So. 3d 1075, 1083 (quoting La. R.S. 14:40.2(C)(1)). Further, "[a] 'pattern of conduct' means 'a series of acts over a period of time, however short, evidencing an intent to inflict a continuity of emotional distress upon the person.'" *Id*. (quoting La. R.S. 14:40.2(C)(2)).

The party seeking the protective order must prove his/her allegations by a preponderance of the evidence. *Patterson*, 19-0333, p. 10, 282 So. 3d at 1083. *See also* La. R.S. 46:2135(B). "Proof is sufficient to constitute a preponderance of the evidence when the entirety of the evidence, both direct and circumstantial, shows that the fact sought to be proved is more probable than not." *Id*. (citing *Head v. Robichaux*, 18-0366, pp. 3-4 (La. App. 1 Cir. 11/2/18), 265 So. 3d 813, 816).

5

*Testimony*[1]

## *Cynthia Badinger*

Ms. Badinger testified that she filed the petition because of "[t]he constant harassment and damage to [her] property over several weeks from David Zeke Falcon and his father, David Kelly Falcon." She stated that Mr. Falcon spends quite a great deal of time at his parents' house, which is next door to her house. She testified as follows:

> I've always had problems with the father, some problems with the son. It has recently escalated to where it had turned into every day. Every day. They won't leave me alone. They won't stay off of my property. They have destroyed all of my landscape timbers. I'm trying to plant trees on my front lawn to keep them from parking on the front lawn and blocking my driveway. And they've stolen my boards. They've driven over the boards. They've constantly destroyed them. It was every day. They've stolen my concrete stones and it won't stop. It's escalating and I just ignore them. I just want to be left alone on my property. They will not leave me alone.
>
> . . . .
>
> The stalking is every time I leave my house. So they're watching when I leave to do the damage, and that's why I put a video camera up to film it. I have David -- David Zeke and his father, both on the same day when I left my house, go and do the damage when I leave. The father came over around 2:00 p.m. He stole my board and smashed on it. It was the eleventh board they have destroyed in less than two weeks, and he stole one of my stones. That's all on video.[2]
>
> And then at 6:00 p.m. that evening, the son came over, drove right up, fully on film. He turned the car off, walked right over to my house next-door -- his mother lives next-door -- he walked right over to my house, kicked my boards, took them, and brought them across the street and through [sic] them on the neighbor's lawn.

---

[1] As the present matter is largely dependent upon the live testimony, we recount some portions at length.

[2] Ms. Badinger admitted a video into evidence depicting Mr. Falcon removing the landscaping boards.

They're stalking me. They're fixated. They're obsessed with everything I do on my own property. I've never stepped foot on their property, ever. I even have his mother on film on my property, a week ago on my property, photographing my house. But she's not photographing from the street. She's walking my property, my driveway, and into my backyard. They won't stay off of my property. I just want to live a peaceful life, a quiet life alone. I want to be left alone on my property.

. . . .

He told me off on the 28th. And I kept opening my door trying to get out the door to walk my door [sic], and he started making all kind of faces and yelling and cursing. His wife was in the car. She took part also. I was only trying to go out of my door to walk my dog. They stay parked in front of my house or on my property when they
can park five cars next-door. It's deliberate harassment to stay in front where they're walking all over my lawn and putting all their things on my lawn while they're loading up the car and everything. I was only trying to go out and walk my little dog. And I kept opening the door every minute or so or — quietly looking out to see if they were leaving yet, and he kept yelling at me, all sorts of things. A lot of it I couldn't understand but loud. And making all sorts of faces at me yelling about he lives in the old neighborhood, something like that. All sorts of things real, real loud. And it went on for a long, long time. I finally closed the door and waited completely till they were gone. Then I went out the front door to walk my door [sic]. And that was on the 28th.

So, you know, he -- it has escalated to this. It's a regular thing. There's no reason to be on my lawn or right in front of my house walking all over the lawn with these problems. It's deliberate, you know. And the -- they park; they block my driveway. They park across my driveway. I do have many, many pictures. I don't have him blocking my driveway, but I have many, many of his father parked across my driveway where I couldn't get out if I wanted to.

. . . .

On July 2nd, I laid two large landscape boards down on the front of my property and placed some concrete garden stones in preparation of planting a

7

garden. Every day since then for 10 or 12 days he and his father went to my property, driving over them, breaking them, taking them, smashing them all up, and stealing the concrete garden blocks. I was never able to order my trees because the trees were over $200 apiece. I'm waiting for the property to be left alone to plant my trees, but they remain -- I can't, you know. I'm sorry. I have to get back to the father. But it was two weeks of problems from both of them leading up to this.

On cross-examination, Ms. Badinger stated that she was unaware that the front of her property might be classified as public property. She testified that Mr. Falcon never entered her home uninvited.

### Captain Andre Joseph Menzies

Mr. Falcon's first witness was Captain Andre Joseph Menzies ("Captain Menzies"), who resides on Gentilly Boulevard next to Mr. Falcon and around the corner from Ms. Badinger and Mr. Falcon's parents. Captain Menzies stated he has known Mr. Falcon for fifteen years and sees him every day. Captain Menzies testified that he did not witness the alleged altercation between Ms. Badinger and Mr. Falcon on July 28, 2023. A determination of the purpose of Captain Menzies' testimony is unclear from the testimony elicited.

### David Zeke Falcon

Mr. Falcon testified that he does not interact with Ms. Badinger, they do not speak, he has never harassed her, and he has never been in her home. In regards to July 14, 2023, the day that Ms. Badinger alleges Mr. Falcon stole her landscaping boards, he stated:

When I'm going over to my parents' house at 4420 Venus Street, I'm going there to pick up my two-year-old daughter. They pick her up from day care at Ursuline. So if I'm going over there, I'm going to pick her up and put her into the car seat and drive home. Occasionally, I stop and have a coffee with my parents and talk. That day I saw what was a[n] obstruction or hazard on public

8

property. And my first thought was my wife parks here and she drives an SUV and she's not gonna see this and she's gonna twist an ankle; she's not gonna see this, and she's gonna trip carrying our two-year-old into the car seat. So I looked at this, not knowing what it was, and I removed two boards that, if I didn't know better, I would think had termite damage. I picked them up and I moved them across the street where they are doing house construction. And often they are leaving boards out there because they are gutting a house. And then I walked into my parents' house and I had a cup of coffee and got my daughter.

He did not have any interaction with her that day. Further, regarding July 28, 2023, when he allegedly cursed at Ms. Badinger, he testified:

Again, my wife and I this time both went to my parents' house on 4420 Venus Street. She and I were going to pick up our two-year-old, so we both went in together this time. We picked up our daughter after talking to my parents and socializing for approximately 30 minutes, walked back out. We carried our daughter. My wife walked into her blue SUV, got in the driver's seat, and turned on the AC. I strapped my daughter in the back seat. At this point Cindy opened her door slightly ajar but began to watch us this entire time but did not come out. The door was slightly ajar, to which I said, "Cindy, close your door. You're air conditioning the whole neighborhood," and then I got in the car and we drove off.

Mr. Falcon stated that he neither threatened nor harmed Ms. Badinger and did not have any intention to do so. He noted that he never parked on the sidewalk and that his entire family avoids Ms. Badinger "at all costs."

The trial court did not permit Mrs. Falcon to testify[3] and found:

Based on the two incidents reflected in the petition and testified, I do not find that these fall into the legal definition of stalking and, thus, these incidents do not rise to the level to warrant an order of protection from

---

[3] The trial court determined no further testimony was necessary. Further, Mrs. Falcon remained in the courtroom during the trial, while all witnesses were instructed to wait in the hall until they were needed.

stalking. And, accordingly, this matter is dismissed with prejudice.

### *Legal Error*

"A legal error occurs when a trial court prejudicially applies incorrect principles of law such that it materially affects the outcome of the case and deprives a party of substantial rights." *Shaw v. Young*, 15-0974, p. 22 (La. App. 4 Cir. 8/17/16), 199 So. 3d 1180, 1193 (citing *1100 S. Jefferson Davis Parkway, LLC v. Williams*, 14-1326, p. 3 (La. App. 4 Cir. 5/20/15), 165 So. 3d 1211, 1215). "Generally, when a legal error interdicts the fact finding process, the manifest error standard no longer applies." *Said v. Federated Rural Elec. Ins. Exch.*, 21-00078, p. 3 (La. 4/20/21), 313 So. 3d 1241, 1243. "If the record is otherwise complete, the reviewing court should conduct a *de novo* review and decide which party should prevail by a preponderance of the evidence." *Id.* (citations omitted).

The trial court expressed its views on the interpretation of La. R.S. 14:40.2 at the start of the hearing as such:

> I have taken a look at it. I have the record right in front of me. My understanding this is specifically a petition for protection from stalking. And the appropriate law in relation to that is the definition of stalking reflects as such:
> "Stalking is the intentional and repeated following or harassing of another person that would cause a reasonable person to feel alarmed or to suffer emotional distress. Stalking shall include but not be limited to the intentional and repeated uninvited presence of the perpetrator at another person's home, workplace, school, or any place which would cause a reasonable person to be alarmed, or to suffer emotional distress as a result of verbal, written, or behaviorally implied threats of death, bodily injury, sexual assault, kidnapping, or any other statutory criminal act to himself or any member of his family or any person with whom he is acquainted" with.
> While I see that the petition reflects that vandalism is, in fact, involved in relation to this case, under the statute where this particular order for protection against

10

> stalking falls under, it does not necessarily include incidents of vandalism. So to the extent that we're moving forward with a petition for protection from abuse from stalking, we shall do so accordingly.

The trial court's narrow interpretation of the statute was also demonstrated by her evidentiary rulings during the trial.[4] Further, the trial court prevented Mrs. Falcon from testifying, stating, "I don't believe I need any further testimony." When ruling, the trial court found, "I do not find that these fall into the legal definition of stalking."

"The starting point in the interpretation of any statute is the language of the statute itself." *Carollo v. Dep't of Transp. & Dev.*, 21-01670, p. 12 (La. 9/1/22), 346 So. 3d 751, 759 (citing *M.J. Farms, Ltd. v. Exxon Mobil Corp.*, 07-2371, p. 13 (La. 7/1/08), 998 So. 2d 16, 26-27). The statute provides that "[s]talking is the intentional and repeated following or harassing of another person that would cause a reasonable person to feel alarmed or to suffer emotional distress." La. R.S. 14:40.2(A). As we cited previously, "'[h]arassing' is defined as 'the repeated pattern of verbal communications or nonverbal behavior without invitation which includes but is not limited to making telephone calls, transmitting electronic mail, sending messages via a third party, or sending letters or pictures.'" *Patterson*, 19-0333, p. 10, 282 So. 3d at 1083 (quoting La. R.S. 14:40.2(C)(1)). This definition specifically includes nonverbal behaviors and the list of potential behaviors is nonexclusive. As such, we find the trial court committed legal error by applying an incorrect interpretation of La. R.S. 14:40.2 and finding that the incidents described did not meet the statutory definition of stalking. Further, we find the

---

[4] The trial court prevented Ms. Badinger from presenting corroborating evidence, namely, a video allegedly depicting Mr. Falcon's father's behavior, which was submitted to show a pattern of Ms. Badinger being targeted for harassment by the family. Also, discussion of vandalism was curtailed, as shown in the excerpt from the hearing above.

record is complete, which permits this Court to conduct a *de novo* review of the record and render a decision without the need for a new trial.

### *De Novo Review*

Ms. Badinger testified that she kept her landscaping boards out to assist in her gardening projects. The video admitted into evidence depicted Mr. Falcon taking the boards from the front of Ms. Badinger's property[5] to a trash pile. We find the video-documented taking of Ms. Badinger's property comports with the definition of harassing. Mr. Falcon explained that his entire family allegedly tried to avoid Ms. Badinger. If that were true, he could have employed a different method and location for parking instead of repeatedly insisting on parking in front of Ms. Badinger's property. For example, parking in his parents' driveway would eliminate the need to step over or avoid Ms. Badinger's landscaping boards or any other property she might have on her lawn. Further, following this incident, Ms. Badinger asserted that Mr. Falcon cursed at her while he and his wife were loading their car. Again, Mr. Falcon could have chosen to park elsewhere and not to utter a word. However, he admitted that he spoke at Ms. Badinger that day. He contends that he simply made a joke and told Ms. Badinger to shut her door. The statement, if true, demonstrates a man intentionally deciding to speak to a woman, whom he claims to avoid, in an intentionally antagonistic manner and for no discernable reason.

We find a reasonable person could become alarmed and potentially suffer mental distress from Mr. Falcon first taking Ms. Badinger's property and then

---

[5] From the hearing transcript, it appears that Mr. Falcon tried to present evidence that the boards were in front of Ms. Badinger's house but were on public property. It is undisputed that whether the boards were located on public property was not proven and there was no expert testimony regarding same.

telling her to close her front door when she was looking outside. While there are only two incidents, these incidents occurred in a short time span and demonstrate Mr. Falcon's willingness to antagonize Ms. Badinger unnecessarily. As such, we find that Ms. Badinger proved by a preponderance of the evidence that she was entitled to a protective order against Mr. Falcon. We render judgment in her favor and remand to the trial court for the limited purpose of issuing the protective order in accordance with this opinion.

## *DECREE*

For the above-mentioned reasons, we find the trial court committed legal error by improperly construing the statutory definition of stalking. This legal error interdicted the fact-finding process. As such, we were required to conduct a *de novo* review of the record, which demonstrates that Ms. Badinger proved by a preponderance of the evidence that she was entitled to a protective order from Mr. Falcon. Therefore, the judgment of the trial court is reversed. We render judgment in favor of Ms. Badinger, granting the protective order. We remand the matter to the trial court for the limited purpose of issuing the protective order in accordance with this opinion.

**REVERSED; RENDERED; AND REMANDED**